**In re AMBER P. et al.**

**No. 2003–399–Appeal.**

Supreme Court of Rhode Island.

June 28, 2005.

---

Karen A. Clark, Esq., Providence, for DCYF, Frank P. Iacono, Jr., Esq., Providence, for CASA, for Plaintiff.

George J. West, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

PER CURIAM.

The respondent-father, William Pandolfi, appeals from a Family Court decree terminating his parental rights to his daughters, Amber P., born October 18, 1997, and Angelica P., born July 15, 2000. This matter came before the Supreme Court for oral argument on May 12, 2005, pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After considering the record and the arguments and memoranda of the parties, we conclude that cause has not been shown, and we will decide the case as this time. We affirm the decree of the Family Court.

The testimony elicited before the Family Court established the following factual background and travel. On March 5, 2001, Amber and Angelica were removed from the custody of their mother, Kelly Pandolfi

(Kelly or mother), after the state filed an *ex parte* motion for an emergency change of placement. Shortly thereafter, Joelle DiDomenico, a caseworker from the Department of Children, Youth and Families (DCYF or department), undertook efforts to reunite the children with their mother. Due to Kelly's inability to attend scheduled meetings and court hearings, failure to contact the department, frequent tardiness, general nonresponsive attitude to DiDomenico's efforts, and culminating with her incarceration for shoplifting and possession of marijuana, however, the department quickly lost confidence in the mother's ability and fitness to serve as a parent to the two young girls. As a result, on January 7, 2002, the children were committed to DCYF's care, custody, and control. After the department took temporary custody of the children, DiDomenico again made extensive efforts to reunite Kelly with her children. Those efforts, which included substance abuse counseling and evaluation, mental health assessment, parenting education classes, and supervised visits with the girls, were, for the most part, unsuccessful in reestablishing a suitable relationship between the children and their mother.

During those efforts, and at all times relevant to this case, the children's father,[1] William Pandolfi (Pandolfi or father), was incarcerated in New Hampshire for aggravated felonious sexual assault. Specifically, Pandolfi was convicted of raping the fourteen-year-old sister of his then live-in girlfriend. In the course of committing this heinous crime, Pandolfi bound the young girl's hands, placed tape over her mouth, repeatedly slapped her face, sliced her chest with a razor blade inflicting a six-inch laceration, and raped her. On April 23, 1998, Pandolfi was sentenced to not more than fifteen years imprisonment, with a minimum of seven and a half years to serve.[2] Pursuant to that sentence, the earliest Pandolfi could be released from incarceration was February 2, 2005. However, it appears from the record that Pandolfi potentially could remain in prison for that offense until July 2014.[3]

On September 24, 2001, respondent contacted caseworker DiDomenico, who previously had sent Pandolfi a letter identifying herself as the DCYF caseworker for the girls. On October 1, 2001, DiDomenico visited Pandolfi at the Adult Correctional Institutions (ACI) in Cranston.[4] During

1. The record reveals that William Pandolfi and Kelly Pandolfi are married and that William is the biological father of Amber. Because Angelica was born while Pandolfi and Kelly were married, he is legally her father, although her biological father is Aaron McKethan.

2. The sentence imposed by the New Hampshire Superior Court provided, in pertinent part, as follows:

"A finding of GUILTY is entered. The defendant is sentenced to the New Hampshire State Prison for not more than fifteen (15) year(s), nor less than seven and a half (7 1/2) year(s). There is added to the minimum sentence a disciplinary period equal to 150 days for each year of the minimum term of the defendant's sentence, to be prorated for

any part of the year. This sentence is to be served as follows: Stand committed. Pretrial confinement credit: 288 days. The Court recommends to the Department of Corrections: Drug and alcohol treatment and counseling; Sexual offender program; Anger Management counseling."

3. There is a discrepancy in the record concerning Pandolfi's potential maximum release date. Although Pandolfi initially informed the court that he could remain in jail until 2012, he later testified at the hearing that his maximum release date is July 2014. In a supplemental memorandum of law to this Court, Pandolfi agrees that his maximum release date is July 2014.

4. When DCYF became involved with Amber and Angelica, Pandolfi was transferred from

their meeting on that date, Pandolfi told the caseworker that he had been incarcerated in New Hampshire for the previous five years. The respondent also told DiDomenico that he had fathered his first child at age thirteen, and that he had since fathered eleven children by five different women. None of these children ever had been in his physical custody. Pandolfi also acknowledged that he had not seen Amber since she was two and a half years old, and admitted that he had never even met Angelica, who was born during his incarceration. In the course of the meeting, Pandolfi acknowledged that he had been imprisoned for committing a rape, although he denied culpability for the crime. Following their meeting, DiDomenico sent documents to the ACI for Pandolfi to execute so that additional evaluations could be conducted. However, Pandolfi refused to sign any of the documents, and he directed that DiDomenico send any further correspondence to his attorney.

In February 2002, Pandolfi filed a motion in Family Court seeking visitation with Amber and Angelica. Before it would approve any visits, however, the court ordered him to undergo sexual offender evaluation. Under that order, DCYF thereaf-

ter referred Pandolfi to Deborah Diamond of the Counseling and Psychotherapy Center, who met with him in June 2002. After considering Diamond's evaluation of the father, the court denied Pandolfi visitation in a decree entered on July 9, 2002.

On September 3, 2002, DCYF filed a petition to terminate respondent's parental rights pursuant to G.L.1956 § 15-7-7.[5] Specifically, the department contended that Pandolfi was unfit as a parent by reason of conduct or conditions seriously detrimental to the children, such as institutionalization, including imprisonment, of such duration as to render it improbable that the father could care for the children for an extended period, and by reason of behavior or conduct that is seriously detrimental to the children. The department also noted that the children had been placed in the custody of DCYF for the statutorily required minimum period of twelve months, that both parents were offered or received services to correct the situation that led to the children's being placed, and that there was not a substantial probability that the children would be able to return safely to the care of their parents within a reasonable period, considering the children's age and need for a

---

New Hampshire to the ACI so that he could be involved in the department's ongoing proceedings regarding the children.

5. DCYF's petition to the Family Court also sought termination of the parental rights of Kelly Pandolfi, biological mother of both Amber and Angelica, and Aaron McKethan, biological father of Angelica. The record reflects that on January 10, 2002, the Family Court made a finding that McKethan had abandoned Angelica, and said that DCYF need not exercise any further efforts to reunify him with her. As a result, the Family Court terminated McKethan's parental rights to Angelica, finding by clear and convincing evidence that he had abandoned and deserted the child, had failed to comply with any plans offered by

DCYF, and had walked away from the situation entirely. Similarly, the court terminated Kelly Pandolfi's parental rights for both children. The court specifically noted that the mother had failed to appear at the termination hearings, despite the diligent efforts of the department to procure her attendance. The court also noted that she had not visited the children in more than a year, had failed to comply with any DCYF plans and keep appointments, and obviously was suffering from a substance abuse problem that she had failed to remedy. Neither McKethan nor Kelly Pandolfi has appealed the termination of their respective parental rights in this matter. Thus, the only appeal before this Court is that of William Pandolfi, biological father of Amber.

permanent home.[6]

The Family Court conducted hearings on the state's petition on five dates between March 12, 2003, and June 26, 2003. The state presented Deborah Diamond as an expert in clinical therapy involving sex offenders. Diamond testified that her examination and analysis of Pandolfi indicated that respondent was very prone to "regressed behavior" that could cause him to become very "agitated," "lash out at people," and "act on violent urges." She also claimed that Pandolfi suffered from an antisocial personality disorder, and that she considered him to be at a high risk to act aggressively and to commit another sex crime. Diamond maintained that respondent appeared to be in total denial about his problems, and that he had refused to take part in any type of offender counseling while incarcerated in either Rhode Island or New Hampshire. Without such counseling, the witness opined, Pandolfi would be unable to reduce his risk factors.[7]

The respondent, appearing *pro se*, testified that he had been incarcerated in New Hampshire since July 10, 1997, had not seen Amber in two and a half years, and had a maximum release date of July 12, 2014. It is significant that during the course of the hearings Pandolfi discharged his court-appointed counsel, Paul Dinsmore. This marked the third time since 2001, when Pandolfi became involved in the department's proceedings concerning

Amber and Angelica, that the father discharged his court-appointed counsel.

On June 27, 2002, the trial justice terminated respondent's parental rights, observing that Pandolfi was convicted of the "heinous crime" of raping a young girl, and that he could potentially be incarcerated until 2014 as a result of that conviction. The court also found that Pandolfi, because of his incarceration, had failed to care for either Amber or Angelica. Lastly, the court expressed its dissatisfaction with Pandolfi's behavior:

"Mr. Pandolfi, this Court not only finds that you have failed miserably to be a father but you have failed to be a proper civilized human being. This Court feels that you are a menace not only to society but perhaps to yourself. This Court finds that it's in the best interest of these children, one of which he is the biological father, the other the psychological father of, to terminate his parental rights."

Pandolfi now seeks our review of that decree, and raises numerous issues within his appeal.

## Analysis and Discussion

### Parental Fitness

On appeal, Pandolfi challenges the trial justice's finding that he was unfit under § 15–7–7(a)(2)(i) and (a)(2)(vii).[8] To sup-

---

**6.** The department's allegations correspond to G.L.1956 § 15–7–7(a)(2)(i), (a)(2)(vii), and (a)(3), respectively.

**7.** Diamond also testified that Pandolfi had himself been abused both physically and sexually as a child by his parents, and her report also summarized numerous incidents of violence toward women that Pandolfi recounted during her interview of him.

**8.** Section 15–7–7 provides, in pertinent part:
"**Termination of parental rights.**—(a) The court shall, upon a petition duly filed by a

governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

(1) The parent has willfully neglected to provide proper care and maintenance for the child for a period of at least one year where financially able to do so. In deter-

port this contention, Pandolfi raises three distinct assignments of error: (1) the trial justice erroneously relied solely on respondent's incarceration as a basis for finding that respondent was unfit under § 15–7–7(a)(2)(i); (2) the trial justice erroneously considered Pandolfi's New Hampshire conviction, the facts underlying that conviction, and respondent's failure to submit to sex offender counseling in his determination of Pandolfi's parental fitness because that conviction was reversed in part and was on appeal throughout the hearings in this matter; and (3) the trial justice erroneously granted the petition to terminate his rights in light of the state's failure to prove Pandolfi's parental unfitness by clear and convincing evidence. We will address each of these claims in turn.

■ "This [C]ourt has previously stated that the termination of parental rights involves a balancing of interests, those of the state, the child, and the natural parents." *In re Kristen B.*, 558 A.2d 200, 203 (R.I.1989). "Although termination of parental rights by its very nature pits the interest of the state against that of the parents, the court should not presume the child and his parents are adversaries." *Id.* Rather, "[a]ll rights to the custody, care, and nurturing of a child first reside with the parents, and 'until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.'" *Id.* (quoting *Santosky v. Kramer*, 455 U.S. 745, 760, 102 S.Ct. 1388,

71 L.Ed.2d 599 (1982)). Therefore, we have held that "[t]he first step before termination of parental rights can occur is a finding of parental unfitness." *In re Alan W.*, 665 A.2d 877, 878 (R.I.1995). "Absent a finding of unfitness, the natural parents right to bear and raise their child in a less than perfect way remains superior to the rights of foster parents who may be exemplary nurturers." *In re Kristina L.*, 520 A.2d 574, 582 (R.I.1987). Once unfitness has been established, [however,] the best interests of the child outweigh all other considerations. *Id.* at 580.

■ With these principles in mind, we turn our attention to respondent's appeal. First, in our opinion, the trial justice did not base his finding of the father's parental unfitness *solely* on Pandolfi's conviction and incarceration. Section 15–7–7(a)(2) provides that one of the findings that can lead to the termination of parental rights is that "[t]he parent is unfit by reason of conduct or conditions seriously detrimental to the child * * *." The statute specifically enumerates "[i]nstitutionalization of the parent, including imprisonment, for a duration as to render it improbable for the parent to care for the child for an extended period of time" as one such "detrimental" condition. Section 15–7–7(a)(2)(i). "Although we have held that the fact of incarceration alone is not sufficient to terminate parental rights, we have allowed the Family Court to find imprisonment, combined with other factors, sufficient to

mining whether the parent has willfully neglected to provide proper care and maintenance for the child, the court may disregard contributions to support which are of an infrequent and insubstantial nature; or

(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

(i) Institutionalization of the parent, including imprisonment, for a duration as to

render it improbable for the parent to care for the child for an extended period of time;

(ii) Conduct toward any child of a cruel or abusive nature;

" * * *

(vii) The parent has exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time[.]"

establish the finding of unfitness under § 15-7-7(a)(2)(i)." *In re Faith H.*, 813 A.2d 55, 57 (R.I.2003). "Such factors can include 'the probable duration of * * * incarceration.'" *Id.* (quoting *In re Micaela C.*, 769 A.2d 600, 604 (R.I.2001)). Significantly, we have held that "[i]n calculating the period of incarceration, the [trial] justice may look to the total sentence, even if the parent is eligible for parole." *Id.*

Contrary to Pandolfi's assertions, our review of the record convinces us that the trial justice primarily relied on the *duration* of Pandolfi's sentence when he concluded that it would be improbable that Pandolfi could care for either child for an extended period. We see no error in this conclusion. Pandolfi is serving a sentence of seven and one-half to fifteen years for a violent sexual assault on a child that occurred in early 1989. His maximum release date appears to be in July 2014, if he serves his entire sentence. As the trial justice correctly observed, there is no guarantee that he will be released from prison prior to that date. Considering that Pandolfi last saw Amber when she was two and a half, and has never even met Angelica, it is quite clear to this Court that the probable duration of his incarceration renders illusory any argument that he could provide any degree of care to either child.

■ Pandolfi next claims that the trial justice erred in even considering his New Hampshire conviction because the Supreme Court of that state had remanded his case to the trial court for consideration of one issue.[9] Concomitantly, Pandolfi asserts that the trial justice should not have considered his failure to partake of sexual offender counseling because respondent was, at the same time, maintaining that he

was innocent of sexual misconduct in his New Hampshire appeal. We disagree. While we are mindful that Pandolfi was pursuing one or the other of his appeals while the termination case was ongoing, we do not believe that the court's consideration of that conviction, or the criminal misconduct alleged therein, constitutes reversible error. We have, it is true, held that "a judgment of conviction on appeal is not final so long as the case is pending on appeal[.]" *State v. Macarelli*, 118 R.I. 693, 696, 375 A.2d 944, 946 (1977). But, it is clear to us that Pandolfi's conviction was neither vacated nor overturned at any time during the Family Court's consideration of the state's termination petition. We understand that a situation such as this can place a litigant such as respondent on the horns of a dilemma. However, that dilemma in no way should preclude the Family Court from carrying out its statutory duty of determining both parental fitness and what is in the best interest of a child. Accordingly, the trial justice was entitled to weigh Pandolfi's New Hampshire conviction, the facts underlying that conviction, and respondent's failure to submit to sex offender counseling, in the court's consideration of DCYF's termination petition. *Cf. In re Shawn B.*, 864 A.2d 621, 624 (R.I.2005) (noting, in *dicta*, that the Family Court would not be precluded from considering a parent's criminal conviction while that parent, during termination proceedings, sought review from this Court of the Superior Court's denial of his petition for postconviction relief).

■ Next, Pandolfi contends that the trial justice erred when he found that the state had sustained its burden of proving by clear and convincing evidence that re-

9. By the time the termination of parental rights hearing began in March 2003, the New Hampshire trial court had denied respondent all relief. That decision was appealed by re-

spondent on January 13, 2003. The appeal was denied by the New Hampshire Supreme Court on May 21, 2004.

spondent was an unfit parent under § 15–7–7(a)(2). Again, we disagree. Our review of the record reveals that the state produced abundant evidence that supports the trial justice's ruling, especially viewed in conjunction with respondent's serious crime and lengthy prison sentence. Most notably, Deborah Diamond testified that Pandolfi has a history of anger control problems, including numerous instances of violence toward women, an inability to control his emotions, and lack of remorse for violent or harmful actions toward others. Diamond stated,

"My sense is that [Pandolfi] has an antisocial personality disorder. He's been untreated. He has no interest in treatment. He doesn't really have a sense of what his issues are. I really believe from my evaluation that he would be at risk to people in the community. * * * I don't really have a sense that he really has the kind of regard for children that would keep them safe. He admitted to doing things to children that were questionable. He couldn't even really assess that some of the things that he did that he minimized were harmful. Anyway, he's the kind of person who could dysregulate very easily. And I mean, there are instances where he himself admitted that he would snap and not know what happened. So I'm very concerned for him because he hasn't had any treatment, and without treatment there's no way to impact some of the problems that he has."

Diamond further testified that Pandolfi's behavior exhibited violent sadism and an inability to cope with numerous traumatic experiences. In addition, Diamond testified that Pandolfi had no interest in pursuing any self-exploration that might foster a better understanding of his aggressive and violent tendencies. She added that Pandolfi was at a high risk to recidivate and act aggressively if given opportunities to be in close proximity to children. Considering this evidence and in light of Diamond's rather negative prognosis, the trial justice found as follows:

"Mr. Pandolfi has had a long history of problems. * * * The record is clear and unambiguous that he * * * is a convicted felon in the State of New Hampshire. Convicted of the heinous crime of raping a 13, 14–year–old girl[.] * * * Earliest release date for Mr. Pandolfi, if all things go well with him, and this Court seriously doubts that all things are going to go well with him, is going to be the year 2005. And he's been incarcerated since 1997. If he serves his time, it's 2014. It's apparent to this Court that there is no way that [Pandolfi] has cared for either his psychological child or his biological child. That he is no position to do so."

■ Section 15–7–7(a) enumerates the findings of fact upon which the Family Court may declare a parent to be unfit, in which case it shall "terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child * * *." Moreover, the statute requires the court to establish such facts by "clear and convincing evidence." *Id.* "On review of cases involving the termination of parental rights, this court must examine the record to determine if legally competent evidence exists to support the trial justice's findings." *In re Jennifer R.,* 667 A.2d 535, 536 (R.I.1995). A finding of parental unfitness under § 15–7–7(a)(2) made by a trial justice is entitled to great weight and will not be disturbed on appeal unless it is clearly wrong or the trial justice misconceived or overlooked material evidence. *In re Jennifer R.,* 667 A.2d at 536. Applying this standard to the facts of this case, it is our firm conclusion that the trial justice did not err. The overwhelm-

ing evidence presented by DCYF and, particularly, the testimony of Deborah Diamond, clearly supports the trial justice's conclusion that Pandolfi was "unfit by reason of conduct or conditions seriously detrimental to the child" under § 15-7-7(a)(2). Thus, the trial justice's decision is firmly grounded in the facts presented to the court.

### Best Interest of the Children

■ Having held as we do that the finding of unfitness in this case was amply supported by the evidence, we also concur in the trial justice's conclusion that termination of Pandolfi's parental rights is in the best interests of both young children. In addition to the evidence regarding Pandolfi's incarceration, violent tendencies, and likelihood of committing another sexual offense, the testimony presented to the trial justice established that Pandolfi has utterly no relationship with either child. Furthermore, the department presented testimony that both children are living in pre-adoptive foster homes and have bonded with their respective foster parents and siblings. Section 15-7-7(c)(1) provides that "[i]n considering the termination of parental rights as pursuant to [§ 15-7-7(a)], the court shall give primary consideration to the physical, psychological, mental, and intellectual needs of the child[,]" including whether the child has been placed in foster care, has been integrated into a foster family, the length of time that the child has lived in a stable environment, the desirability of maintaining the environment and continuity for the child, and the child's own preference. *See* § 15-7-7(c)(1)(2)(ii). Considering these factors in

light of the evidence provided to the court, we cannot fault the trial justice's finding that termination of Pandolfi's parental rights was in the best interests of both Amber and Angelica.

### Reasonable Efforts

■ Pandolfi next contends that the trial justice erred when he found that DCYF undertook "reasonable efforts" to "encourage and strengthen the parental relationship" as it is required to do under § 15-7-7(b)(1).[10] In termination cases, in addition to proving parental unfitness under § 15-7-7(a)(2), the state is obligated to prove by "clear and convincing evidence that regardless of a parent's behavior, the department has made reasonable efforts to encourage and strengthen the parental relationship." *In re Alan W.*, 665 A.2d at 878. However, we have recognized that the concept of reasonable efforts is not a rigid standard, but one of some flexibility that must "be defined by the particular facts and circumstances in a case[.]" *Id.* (citing *In re Ann Marie*, 461 A.2d 394, 395 (R.I.1983)). Moreover, we apply the same deferential standard of review to the findings of a trial justice under § 15-7-7(b)(1) as we apply to findings under § 15-7-7(a)(2), and, therefore, will not disturb such factual determinations unless the trial justice overlooked or misconceived material evidence or was clearly wrong as a matter of law. *In re Antonio G.*, 659 A.2d 672, 673 (R.I.1995).

■ Here, Ms. DiDomenico testified that case plans were created for Mr. Pandolfi and that he was referred to Diamond for evaluation. DiDomenico added that

10. Section 15-7-7(b)(1) provides that "[i]n the event that the [termination] petition is filed pursuant to subdivisions (a)(1), (a)(2)(i), (a)(2)(iii), or (a)(2)(vii) of this section, the court shall find as a fact that, prior to the granting of the petition, such parental conduct or conditions must have occurred or existed notwithstanding the reasonable efforts which shall be made by the agency prior to the filing of the petition to encourage and strengthen the parental relationship so that the child can safely return to the family."

Pandolfi refused to sign a release authorizing paternity testing, and that he flatly refused to take part in any type of sexual offender treatment in either New Hampshire or in Rhode Island since his incarceration in 1997.[11] It is apparent to us that the department's efforts have been hampered by Pandolfi's obstinance as well as his failure to accept responsibility for his criminal actions. As a result, Pandolfi has refused sexual-abuse counseling. Applying our deferential standard of review to the circumstances presented by this case, we conclude that the trial justice's finding is supported by the evidence presented to the court. We are mindful that "it is 'the parent, not DCYF, whose children are in the care of an authorized agency [who] is responsible to substantially and repeatedly maintain contact with the children[,]" *In re Shaylon J.*, 782 A.2d 1140, 1143 (R.I.2001) (quoting *In re Devone S.*, 777 A.2d 1268, 1272 (R.I.2001)), even in such circumstances when that parent is incarcerated. *In re Shawn B.*, 864 A.2d at 623. *Cf. In re Diamond I.*, 797 A.2d 1076, 1077–78 (R.I. 2002) (mem.) (noting that department is under no obligation to make reasonable efforts to reunite a parent and child when DCYF alleges abandonment under § 15–7–7(a)(4)).

■ Moreover, we see no merit in Pandolfi's contention that the state's failure to provide visitation with Amber and Angelica precludes DCYF from prevailing on its termination proceeding. The record in this case reveals that after Pandolfi filed a motion for visitation with the Family Court in February 2002, the state was ordered to arrange for a sexual offender evaluation of Pandolfi. After considering Diamond's evaluation of the father, however, the Family Court denied his visitation rights

in a decree entered on July 18, 2002, and from which Pandolfi failed to file any appeal. Accordingly, DCYF was under no obligation to provide visitation to Pandolfi in the face of that court order.

### Expert Witness Qualification

■ It also is urged to this Court that the trial justice improperly admitted the expert testimony of Deborah Diamond, which, according to the respondent, lacked adequate foundation and scientific trustworthiness. However, "[i]t is an established rule in Rhode Island that this Court will not review issues that are raised for the first time on appeal." *Union Station Associates v. Rossi*, 862 A.2d 185, 192 (R.I. 2004) (citing *State v. Grant*, 840 A.2d 541, 546 (R.I.2004)). "According to our well settled raise or waive rule, a litigant must make a timely and appropriate objection during the lower court proceedings before this Court will indulge the issue on appeal." *Id.* (quoting *Grant*, 840 A.2d at 546). The record in this case establishes that Pandolfi's counsel conducted a full *voir dire* of Diamond before she testified at trial. When the court qualified the witness as an expert in the field of clinical therapy dealing with sex offenders, neither Pandolfi nor his counsel raised any objection. Consequently, Pandolfi may not now, on appeal to this Court, challenge the trial justice's qualification of the witness as an expert.

### Ineffective Assistance of Counsel

The respondent's final points of appeal are that he was denied adequate assistance of counsel and that he did not meaningfully waive legal representation in the proceedings below. Although both contentions lack merit, we will address each briefly.

---

11. The sentencing judge in the New Hampshire Superior Court specifically recommended drug and alcohol counseling, sexual offender program, and anger management counseling.

■ First, our review of the record reveals that at the commencement of the hearings on the state's termination petition, Pandolfi was represented by a court-appointed lawyer, Paul Dinsmore.[12] On the morning of the third day of hearings, however, Pandolfi requested that Dinsmore be removed from the case. At that point in the proceedings, the trial justice encouraged respondent to retain his counsel and made sure that Pandolfi was aware of the pitfalls of proceeding *pro se.* The following exchange took place:

"THE COURT: This is your third attorney.

" * * *

"THE COURT: It's your last. He goes, you are on your own; do you understand that?

" * * *

"THE COURT: You will be allowed only to conduct yourself as an attorney conducts himself in a courtroom. You will get no special privileges. You will get only those rights that are granted to an attorney who would have been here representing you. Now, I caution that you are foolish to do that because you know nothing about the law and you place yourself in jeopardy by doing this. I want you to understand that. Do you understand that, sir?

" * * *

"MR. PANDOLFI: Yes, sir."

■ Considering the record, it is evident that Pandolfi has failed to allege any basis for a finding that he did not knowingly waive his right to counsel. "As with other constitutional questions, this Court reviews such a determination *de novo*, giving deference to the lower courts findings of * * * fact." *State v. Thornton*, 800 A.2d 1016, 1026 (R.I.2002). The record unambiguously indicates that the trial jus-

tice fully advised the respondent of the consequences of proceeding *pro se,* and that Pandolfi acknowledged that he understood those consequences. We need go no further to determine that Pandolfi's decision was, indeed, the product of a knowing waiver of court-appointed counsel.

In addition, we note that after Pandolfi dismissed Dinsmore, the trial justice appropriately ordered that lawyer to remain as standby counsel to protect Pandolfi's rights during the hearing. "We have held that there is no mandate to appoint substitute counsel, once a respondent has discharged appointed counsel[.]" *In re Ginger G.*, 775 A.2d 255, 258 (R.I.2001) (quoting *In re Bryce T.*, 764 A.2d 718, 721 (R.I.2001)). "However, we also suggested that trial [justices] should direct that an appointed, dismissed attorney serve as stand-by counsel in the event the unrepresented party is unable to proceed *pro se* or requires assistance during trial." *Id.* (quoting *In Re Bryce T.*, 764 A.2d at 722). Thus, there is no question that the trial justice not only acted in accordance with the law in this case, but also that he went beyond the standard necessary to protect Pandolfi's rights. Moreover, Pandolfi has failed to specify any grounds on which to base any argument that he was denied adequate assistance of counsel.

### Conclusion

In light of the foregoing, we affirm the Family Court decree terminating Pandolfis parental rights.

---

12. Dinsmore was Pandolfi's third court-ap- pointed counsel since 2001.