**In re MANUEL P. et al.**

**No. 2002–679–Appeal.**

Supreme Court of Rhode Island.

Jan. 9, 2006.

Karen A. Clark, Esq., Providence, for DCYF.

Frank P. Iacono, Jr., Esq., for CASA.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

In these cross-appeals, the respondent-mother, Paulette Milner, appeals from a Family Court judgment terminating her parental rights to her daughter, Anne Marie P., born October 14, 1994. The Department of Children, Youth and Families (DCYF or department) cross-appeals from the Family Court's decision not to terminate Milner's parental rights to her sons, Manuel P., born May 13, 1993, and Stephen M., born September 26, 1996. We affirm the decree of the trial justice and deny both appeals.

### Facts and Procedural History

DCYF's involvement with this family began in 1998, when the department was informed that Anne Marie was experiencing nosebleeds. However, the events that prompted the removal of the children from the home began on March 8, 1999, when Milner returned to her residence after a six-hour shopping trip. While she was away from the home, Milner entrusted Dennis Barone, a man with whom she and her three children then resided, with the care of Stephen and Ann Marie. Upon returning to the home, she found Anne Marie crying and complaining of pain in her arm. Barone claimed that a window fell on her. Milner then walked Anne Marie to a nearby fire station. Firefighters transported the child to Pawtucket Memorial Hospital, but because there was a high suspicion of child abuse, she was

Janice M. Weisfeld, Esq., Providence, for Petitioner/Cross–Respondent.

transferred to Hasbro Children's Hospital. The hospital report revealed a fractured right radius and ulna and multiple ecchimoses and abrasions at different healing stages. There were also marks on her left arm, "which suggested being grabbed; [and] marks on her left arm and back, which suggested that the child had been held down." In addition, Anne Marie had bruising on her abdomen, which was most likely the result of direct trauma such as a kick, punch, or other blow. Laboratory data revealed that the trauma had resulted in acute pancreatitis, which can be a life-threatening condition.

On March 9, 1999, James Blue, a child protective investigator for DCYF went to Milner's home to investigate the allegations of abuse. He found the home to be in a deplorable condition: there were dirty clothes strewn about, rotting food, animal feces in every room and on the children's beds, and a repulsive smell emanating throughout the house. He also observed the boys, Manuel and Stephen. Stephen appeared to have two black eyes and Manuel had bruises on his face. Upon viewing this horrific scene, Blue called the Pawtucket Rescue so that the children could be examined by health-care professionals.

Anthony Marsella, also a child protective investigator for DCYF, went to Hasbro Children's Hospital on March 9, 1999, to interview Anne Marie. Marsella testified that the child had a full cast on her right arm, was wearing a surgical collar, and was connected to a feeding tube. She also was covered in bruises and appeared to be rather frightened. Marsella said that when he mentioned the name Dennis Barone, Anne Marie became extremely scared, closed her eyes, and shook her head.

A Rhode Island Hospital consultation report concluded that Anne Marie's physical examination "clearly demonstrate[d] that she was a victim of physical abuse on more than one occasion." Moreover, "it would be impossible for Paulette Milner to have lived in the same home with this child * * * and never notice the significant trauma that her daughter * * * had sustained on multiple occasions." Further, the report stated that Milner's conduct, including her directive to Anne Marie at the hospital to "remember your pinky swears," strongly suggested that Milner knew of the abuse and was coaching her child to lie about what happened to her. Because Anne Marie was very scared and her mother appeared to be incapable of protecting the child or providing a safe environment, the report recommended that Anne Marie be removed from her mother's care and undergo counseling.

Dennis Barone admitted to investigators of the Pawtucket Police Department that he had a problem controlling his anger, which caused him to strike the children, throw them against the furniture or to the floor, pick them up by their heads and necks, and squeeze their heads. Barone also admitted that it was more than likely that he broke Anne Marie's arm when he slammed her on the couch. Jane Willis, a licensed clinical social worker for the Bridges Counseling Center, conducted an evaluation of Anne Marie in which the child disclosed that on more than one occasion Barone had sexually abused her. The report concluded that Barone had engaged in vaginal and anal penetration of the young girl, and that Milner was present during such incidents.[1] Willis maintained that as a result of the abuse, Anne Marie

---

1. On September 1, 2000, Dennis Barone pled nolo contendere to an amended charge of felony assault against Anne Marie, and he received a seven-year sentence, two years to serve, with the balance suspended with probation.

exhibited aggressive and sexualized behavior, often masturbating until she bled.

On March 11, 1999, DCYF filed ex parte petitions against Milner alleging abuse and neglect, and it requested the Family Court to remove all three children from the home. The Family Court found that Milner had neglected the children by failing to provide them with a minimum degree of care, supervision, or guardianship. Accordingly, on April 23, 1999, the court committed the three children to the care, custody, and control of DCYF, and they have remained in placement since that time.[2] Milner was permitted to have biweekly supervised visits with the children.

Michelle Paquette–Canning was the caseworker initially assigned to the family. In accordance with the department's policies, she developed a case plan to achieve reunification of the family. Pursuant to this case plan, Milner was to undergo a psychological evaluation conducted by Dr. John Parsons. Paquette–Canning also offered Milner parent-aide services, which she declined, organized a visitation schedule for Milner and the children, and referred Anne Marie for counseling and evaluation. Paquette–Canning testified that she did not make referrals for Milner to receive additional services because she was waiting for Dr. Parsons' evaluation to be completed: "the department didn't want to overwhelm her with services * * * [y]ou want to provide them [with] the proper and appropriate services, so you wait for the report from the provider or the psychologist, to make the recommendations."

Doctor Parsons conducted an evaluation of Milner in August 1999 and testified at trial regarding his opinions.[3] He described Milner as "a passive dependent woman who tends to involve herself in one abusive relationship after another." She is illiterate and is capable of only borderline intellectual functioning. When asked whether Milner could ever safely parent her children, Dr. Parsons testified that based upon her "long term history of abuse, non-compliance with services, her repeated involvement in abusive relationships, and the termination of two other children's rights * * * [t]here were no services that could [have] perhaps enhanced her level of functioning where she can parent safely." [4] Dr. Parsons recommended that Milner be allowed a brief period to be compliant with the case plan, but also strongly advised DCYF to consider terminating her parental rights to ensure the care, safety, and protection of the children.

DCYF filed petitions on February 2, 2001, to terminate Milner's parental rights to Anne Marie, Stephen, and Manuel. The trial justice's written decision, which was entered on June 21, 2002, granted the termination of parental rights as to Anne Marie, but denied termination with regard to Manuel and Stephen. The trial justice held that, although DCYF had made reasonable efforts to reunite Milner and Anne Marie before it filed a termination petition, it had not satisfied that statutory obligation with regard to Stephen and Manuel. The trial justice outlined the minimal ef-

**2.** In addition, on September 30, 1999, Milner pled nolo contendere to criminal charges that she had permitted her children to be "habitual sufferers for want of proper care," for which she received a three-year suspended sentence and was placed on probation.

**3.** We note that Dr. Parsons scheduled four sessions with Milner but that she attended

only two. Nevertheless, Dr. Parsons testified that he was able to form an opinion of her mental status to a reasonable degree of scientific certainty.

**4.** The record reveals that Milner's rights to two other children were terminated in Nevada.

forts DCYF made to reunite the family and explained how the department failed to follow through with a number of potentially helpful options:

"In this case, the services provided were a psychological evaluation, a mental health evaluation and parent education classes * * * [b]oth Alisha Youch and Bethany Gregor recommended an in-home parenting aide. Ms. Gregor also suggested a parent support group and Jane Willis recommended a non-offending parent's group on several occasions. No referrals were ever made to implement these services, nor were they ever included in a subsequent case plan. Nor, for that matter, did DCYF maintain regular contact with service providers." [5]

The trial justice concluded that DCYF did not prove by clear and convincing evidence that it made reasonable efforts with regard to Manuel and Stephen. However, after viewing the totality of the circumstances, including Anne Marie's special needs and Milner's cognitive limitations, the trial justice found that DCYF had made reasonable efforts to reunite Milner with Anne Marie.

On appeal, Milner argues that in light of the trial justice's finding that DCYF failed to make reasonable efforts to reunite Stephen and Manuel with their mother, he erred in ruling that DCYF's efforts were reasonable as to Anne Marie. Conversely, DCYF argues that the trial justice erred when he denied the termination of parental rights petition as to Stephen and Manuel after finding that DCYF had made reasonable efforts with regard to Anne Marie.

### Standard of Review

■ General Laws 1956 § 15–7–7(a) "enumerates the findings of fact upon which the Family Court may declare a parent to be unfit, in which case it shall 'terminate any and all legal rights of the parent to the child * * *.'" *In re Amber P.*, 877 A.2d 608, 617 (R.I.2005). The statute requires the court to "establish such facts by 'clear and convincing evidence.'" *Id.* Moreover, "[o]n review of cases involving the termination of parental rights, this [C]ourt must examine the record to determine if legally competent evidence exists to support the trial justice's findings.'" *Id.* A finding of parental unfitness made by a trial justice "is entitled to great weight and will not be disturbed on appeal unless it is clearly wrong or the trial justice misconceived or overlooked material evidence." *Id.*

### Analysis

### I

### Reasonable Efforts at Reunification

■ When a petition to terminate parental rights is filed pursuant § 15–7–7(a)(2)(vii) or § 15–7–7(a)(3), as it was in this case, DCYF must prove by clear and convincing evidence that it made reasonable efforts to reunite the family, before a parent's rights can be terminated. *In re Amber P.*, 877 A.2d at 618 ("In termination cases, in addition to proving parental unfitness under § 15–7–7(a)(2), the state is obligated to prove by 'clear and convincing evidence that regardless of a parent's behavior, the department has made reasonable efforts to encourage and strengthen the parental relationship.'"); *In re Brianna D.*, 798 A.2d 413, 415 (R.I.2002) ("[A] finding of parental unfitness is insufficient unless the agency can also establish that, 'pursuant to § 15–7–7(a)(3), [the agency

---

**5.** Alisha Youch is employed by the Community Counseling Center and assessed Milner's need for psychotherapy. Bethany Gregor is a social worker with DCYF who testified at trial.

made] reasonable efforts to strengthen the parental relationship * * *.' "). We have held that "the concept of reasonable efforts is not a rigid standard, but one of some flexibility that must 'be defined by the particular facts and circumstances in a case.' " *In re Amber P.*, 877 A.2d at 618.

## II

### Stephen and Manuel

■ DCYF contends that reasonable efforts were made to reunite Milner with her sons, Stephen and Manuel, and that in ruling to the contrary, the trial justice overlooked services that were offered during the first twelve months in which the children were in state custody. The department asserts that the court misconceived material evidence when it failed to give the necessary weight to services DCYF did provide, specifically its referral of Milner to the Community Counseling Center (CCC) for mental health consultation and to Blackstone Valley Community Action Program (BVCAP) for parent education classes.

With regard to the parent education program at BVCAP, the trial justice commented that this service "was not particularly suited to Ms. Milner's individual needs and cognitive deficits. Although she diligently attended all classes, she gained little insight from the program. Other approaches were suggested—an in-home parent aide and parent support group—but there was no follow up by DCYF." The trial justice also discussed DCYF's referral of Milner to CCC for mental health counseling. Although he considered it to be an appropriate service, the trial justice criticized the way in which the counseling was handled. He noted that the mental health professional who met with Milner "administered no tests nor did she utilize any other psychological tools [and] [a]lthough she was apparently aware

of Dr. Parsons' evaluation, it is clear that she had never actually read it." Even more troubling to the court was that subsequent to CCC's finding that Milner was not a candidate for insight-oriented therapy because of her limited intellectual functioning, DCYF made no referrals for alternative services such as cognitive behavioral therapy, as suggested by Dr. Parsons, or parent aide services, as recommended by Ms. Youch and Ms. Gregor. The trial justice concluded that "[a]ll of the professionals involved in this case indicated that there are [additional] services from which Ms. Milner might benefit and which might assist her to achieve at least a basic level of parenting skills." Based upon DCYF's failure to refer Milner to such services, the trial justice ruled that DCYF had not proven by clear and convincing evidence that it made reasonable efforts to reunite Milner with her two sons, Manuel and Stephen. We are satisfied that the court did consider the services provided, but found them to be insufficient in relation to the sons.

■ DCYF also contends that its efforts were reasonable in light of Milner's noncompliance with the case plan. We have stated in the past that "this court does not expect the impossible from the various agencies that deal with child protection and placement." *In re Kristen B.*, 558 A.2d 200, 204 (R.I.1989). Nor do we desire to "burden the agency with the additional responsibility of holding the hand of a recalcitrant parent." *Id.* Here, the trial justice found that Milner had not been fully compliant with her obligations under the case plans. Moreover, "[o]n several occasions Ms. Milner flat out denied that either she or her children had any need for treatment." However, we agree with the trial justice's ruling that Milner's noncompliance "[did] not obviate the need for

DCYF to provide appropriate services in the first place."

■ Finally, DCYF argues that its efforts at reunification were reasonable in light of Milner's limited mental capabilities. The department relies heavily on Dr. Parsons' testimony that "it is highly doubtful that any intervention can be formulated that will make any significant changes in this woman's behavior, attitude, or level of functioning." However, our case law mandates that "when DCYF is required by statute to pursue reasonable efforts before filing for termination, it is required to do so 'regardless of the unlikelihood for success.'" *In re Christopher B.*, 823 A.2d 301, 311 (R.I.2003). DCYF's contention that its efforts were reasonable because it was unlikely that any services would help reunite the family flies directly in the face of our well-established case law in this area, and we afford it no value.

Our review of the record reveals that there is legally competent evidence to support the trial justice's findings. Moreover, the trial justice was not clearly wrong and did not misconceive or overlook material evidence. Therefore, we affirm his decision not to terminate Milner's parental rights with regard to Stephen and Manuel.

### III

### Anne Marie

■ The trial justice granted the termination of Milner's parental rights to her daughter, Anne Marie, stating that it is "abundantly clear that no intervention or service will enable Ms. Milner to parent effectively a child with such special and particularized needs as Anne Marie [who] presents with many behavioral issues, particularly aggression and sexualized behaviors [and] requires an extremely high degree of care, nurturance, consistency and stability." Further, the trial justice held that Milner's "personality disorder, her cognitive limitations, her less than absolute compliance with the case plans, her denials that she is in need of mental health treatment or parenting assistance and her lack of insight," indicate that she will never, and certainly not within a reasonable period, be able to attain the skills necessary to protect and care for Anne Marie. The trial justice opined that a successful reunification of Anne Marie and her mother would require "complete cooperation and total commitment by Ms. Milner to engage in a wide array of mental health, parenting and other services * * * [and] would undoubtedly entail monumental efforts by both DCYF and Ms. Milner." The trial justice concluded that reunification within a reasonable period would be impossible because "Ms. Milner is either unwilling or incapable of making that commitment." Accordingly, the court found that DCYF had shown by clear and convincing evidence that its efforts to reunite Anne Marie with her mother were reasonable.

Milner contends that the trial justice erred in finding that DCYF made reasonable efforts to reunite her with Anne Marie. She relies upon our decision in *In re Christopher B.*, in which we reaffirmed our previous unequivocal statement that "when DCYF is required by statute to pursue reasonable efforts before filing for termination, it is required to do so '[r]egardless of the unlikelihood for success.'" *In re Christopher B.*, 823 A.2d at 311 (quoting *In re Joseph S.*, 788 A.2d 475, 477 (R.I.2002)). For the court to conclude that a parent "would not benefit from services never attempted would be to adopt a rule that mentally impaired parents are *per se* incapable of parenting * * *." *Id.* at 312. Milner contends that while reunification may have required extraordinary efforts, DCYF utterly failed to provide the appropriate services. She maintains that

without these services having been provided, the trial justice's finding that reasonable efforts had been made amounted to a holding that Milner's mental health and cognitive deficiencies rendered her *per se* incapable of parenting a child with post-traumatic stress disorder and contravened our holding in *In re Christopher B.*

On the other hand, DCYF argues that the trial justice did not hold that Milner was *per se* incapable of parenting Anne Marie; rather, his decision to terminate Milner's parental rights was based on many additional facts. DCYF refers to the trial justice's finding that:

> "Ms. Milner has not been fully compliant with the case plan. Although she completed the BVCAP parenting program and the assessment at Community Counseling Center, she has failed to sign all necessary releases in a timely manner, she did not attend all the sessions with Dr. Parsons and has on several occasions denied that she is in need of either mental health counseling or parenting assistance."

The state argues that in light of these findings, further services were not appropriate. Therefore, it contends that the trial justice did not err in holding that DCYF had made reasonable efforts at reuniting Milner with Anne Marie.

Because this Court is evenly divided with regard to Milner's appeal, the judgment terminating her parental rights to Anne Marie is affirmed. *See Kells v. Town of Lincoln,* 874 A.2d 204, 215 (R.I. 2005); *Soares v. Ann & Hope of Rhode Island, Inc.,* 637 A.2d 339, 353 (R.I.1994).

## Conclusion

For the foregoing reasons, the state's appeal of the judgment not to terminate Milner's rights with respect to Manuel and Stephen is denied. However, this Court being evenly divided, we affirm the Family Court decree terminating Milner's parental rights to Anne Marie. The record in this case may be remanded to the Family Court.

Justice SUTTELL did not participate.