## In re ROSALIE H. et al.

### No. 2004–1–Appeal.

Supreme Court of Rhode Island.

Jan. 9, 2006.

Christopher E. Heberg, Esq., North Providence, for Petitioner.

Karen A. Clark, Esq., Providence, for Respondent DCYF.

Frank P. Iacono, Jr., Esq., for CASA.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

The respondent father, Peter Houle, and respondent mother, Virginia Houle, appeal from a Family Court decree terminating their parental rights to their daughter, Rosalie H., born April 9, 1989, and son, Gregory H., born April 17, 1992.[1] We affirm the decree of the trial justice.

### Facts and Procedural History

The Department of Children, Youth and Families' (DCYF or department) involvement with the Houle family began in January 1999, when two former foster children alleged that Peter Houle had sexually abused them while the couple was entrusted with their care.[2] When the department first became involved with the family, Peter and Virginia Houle resided together with their two children, Rosalie and Gregory. Investigators from Child Protective Services informed the Houles of the abuse allegations and advised Peter that if he did not leave the home, Rosalie and Gregory would be removed. Initially, Peter left the home so that Virginia could reside there with the children. Before long, however, Peter returned and Virginia placed the children with Denise Marshall, a family friend of the Houles'. An order of the Family Court, which was entered on July 8, 1999, permitted Virginia to reside with and provide care for Rosalie and Gregory at Marshall's home while Peter occupied the family domicile. The order restrained Virginia from permitting Peter to have contact with the children. She soon disregarded this prohibition, however, and allowed Peter to see Rosalie and Gregory. Based upon evaluations of the children conducted by Anthony Franco,[3] which disclosed that Virginia had flouted the court order, the Family Court removed the children from her care.[4] Both children have been in the legal custody of DCYF since November 1999.

Michaela Dolan was the DCYF social worker assigned to the Houle case when it was opened in March 1999, and she remained involved until June 2002. In accordance with departmental procedures, Dolan developed a case plan for the Houle family, which was aimed at reuniting Peter and Virginia with their children. Asserting that his participation would adversely affect the outcome of his criminal trial, Peter refused to sign the case plan or engage in any services aimed at reunification with Rosalie and Gregory. Peter's resolve not to cooperate with DCYF or discuss plans for his children's future persisted, even though DCYF drafted subsequent case plans calling for his participation in services only after the resolution of the criminal case. In fact, Peter never agreed to cooperate with DCYF, refusing to engage in case planning even after he was acquitted of all criminal charges.

1. Rosalie and Gregory are not the biological children of the Houles; they were adopted by the Houles.

2. In March 1999, Peter was charged with eleven counts of child molestation. On October 22, 2001, Peter was acquitted of all criminal charges.

3. Anthony Franco is a licensed clinical social worker.

4. Order of the Family Court, Nos. 99–4079–02, 99–4079–03, November 17, 1999.

Virginia likewise refused to sign the initial case plan, but she did agree to participate in a non-offender evaluation if she was allowed to choose the evaluator. This request was honored by DCYF, and Virginia chose Bonnie Sweberg, a licensed clinical social worker, who completed an evaluation and made recommendations both to her and DCYF. Despite having chosen the evaluator, however, Virginia refused to comply with the recommendations because she claimed that Sweberg was biased against her. That was the end of Virginia's cooperation; thereafter she refused all DCYF reunification services.

On February 8, 2000, with the advice of counsel, Virginia and Peter admitted in the Family Court to allegations of neglect. On the basis of those admissions, both children were formally committed to the care, custody, and control of DCYF. The trial justice ordered Virginia to engage in non-offender counseling, and she was permitted to have supervised visits with the children. On the other hand, Peter was restrained from having any contact with the children. Unfortunately, Virginia's visits with the children were not successful. She often became hostile toward them and attempted to discuss Peter's ongoing legal matters. In March 2001, Gregory alleged that Virginia sexually abused him and he said that he no longer desired to visit with her. Also, the children's therapist believed that the visits no longer were in their best interests. Therefore, visitation ceased in April 2001.

Following the Houles' admission of neglect, DCYF persisted in its efforts to engage the parents in case planning and to advise them about the welfare of their children, but to no avail. The Houles were hostile toward their caseworkers and showed no interest in planning for the future of their children. They often refused to sign releases so that the children could be evaluated, receive services from the department, or even travel outside the state on vacation. Despite DCYF's commendable efforts, the parents rebuffed every offer of assistance to them and resisted services being provided to their children.

Significantly, Virginia said that she did not want Rosalie back because she considered her to be a liar and a troublemaker. Peter also testified that Rosalie should remain in placement. On the other hand, Peter stated that he loved Gregory, but he acknowledged that Gregory does not want to return to the Houles.

On October 22, 2001, Peter was acquitted of all criminal charges against him in connection with the foster children. Still, both parents refused to engage in case planning, and on February 14, 2002, DCYF filed termination of parental rights petitions against each of them. Count 1 of the petition, filed pursuant to G.L.1956 § 15–7–7(a)(3), alleged that the children had been in the legal custody of DCYF for at least twelve months, that the parents were offered services to correct the situation that led to the children being placed, and that there was not a substantial probability that the children would be able to return to the parents' care within a reasonable period considering the children's ages and need for a permanent home. Count 2, referring to § 15–7–7(a)(4), alleged that the Houles had abandoned or deserted the children. After trial, the Family Court found that DCYF had proven every element of counts 1 and 2 by clear and convincing evidence, and the trial justice determined the parents to be unfit. The Family Court then considered the best interests of both children and found that the need for stability and permanency in both of their lives warranted the termination of the Houles' parental rights.

On appeal, the Houles argue (1) that the Family Court erred when it failed to make a specific finding of unfitness, (2) that the trial court's finding of unfitness based on the Houles' repeated refusals to accept services was unconstitutional because it infringed upon their Fifth Amendment rights against self-incrimination, (3) that DCYF did not make reasonable attempts to reunify the family, and (4) that the state violated the Houles' constitutional due process rights by first denying them visitation and then alleging that they abandoned their children.

### Standard of Review

Section 15-7-7(a) "enumerates the findings of fact upon which the Family Court may declare a parent to be unfit, in which case it shall 'terminate any and all legal rights of the parent to the child * * *.'" *In re Amber P.*, 877 A.2d 608, 617 (R.I.2005). "[T]he statute requires the court to establish such facts by 'clear and convincing evidence.'" *Id.* Moreover, "'[o]n review of cases involving the termination of parental rights, this [C]ourt must examine the record to determine if legally competent evidence exists to support the trial justice's findings.'" *Id.* A finding of parental unfitness made by a trial justice "is entitled to great weight and will not be disturbed on appeal unless it is clearly wrong or the trial justice misconceived or overlooked material evidence." *Id.*

### Analysis

### I

### Finding of Unfitness

It is well settled that a finding of unfitness must be made before the Family Court may terminate parental rights. *In re Amber P.*, 877 A.2d at 615. "Absent a finding of unfitness, the natural parent's right to bear and raise their child in a less than perfect way remains superior to the

rights of foster parents who may be exemplary nurturers." *Id.* (quoting *In re Kristina L.*, 520 A.2d 574, 582 (R.I.1987)). However, once unfitness has been established, the court must place the best interests of the child above all other considerations. *Id.* On appeal, the Houles argue that the trial court erred because it failed to make a finding of unfitness. They also assert that the record is devoid of any evidence of parental unfitness. We see no merit in these contentions.

The trial justice found the parents to be unfit pursuant to § 15-7-7(a)(3) and (4). Section 15-7-7(a)(3) states in pertinent part:

"(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

" * * *

"(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home."

Our case law has been consistent in requiring that before termination may occur, it is incumbent upon DCYF to prove by clear and convincing evidence that it made reasonable efforts, despite the parent's behavior, to encourage and

strengthen the parental relationship. *In re Kristen B.*, 558 A.2d 200, 203 (R.I.1989). Conversely, a parent whose child is in the care of DCYF has an obligation "(1) to maintain contact with the child and (2) to plan for the child's future." *Id.* at 204. Moreover, a parent's lack of interest in his or her child evidenced by an unwillingness to cooperate with DCYF services can be a basis for a finding of unfitness. *See In re Robert S.*, 840 A.2d 1146, 1149 (R.I.2004) ("There was clear and convincing evidence in the record to support the Family Court justice's finding that respondent was an unfit father * * * based on his overall lack of interest in the children. As Ms. Aylward testified, two case plans were created specifically for respondent to prevent the termination of his parental rights, yet respondent failed to comply with either plan.").

The trial justice found that notwithstanding the Houles' "total lack of cooperation and their consistent refusal to engage in case planning or services" DCYF persevered in its attempts to consult them in developing new case plans to reunite the family. DCYF also offered Peter and Virginia comprehensive services, including evaluations and treatment programs, to deal with the issues that led to the opening of this case. DCYF continued to advise the parents about their children's medical and psychological conditions and the services required to address those conditions, despite their hostile attitudes toward the department and its employees. With regard to the parents' obligation to maintain contact with the children and plan for their future, the trial court found that the Houles had failed in this respect, holding that their refusal to engage in evaluations or participate in recommended treatment

was "the sole cause of the lack of success in reunifying this family."

Further, the evidence reveals that Virginia violated a court order by permitting Peter to have contact with the children. In addition, the trial justice noted that although Peter was acquitted of the criminal charges against him in Superior Court, he consistently failed to address the abuse allegations in connection with the Family Court proceeding. This is true, as well, with respect to Gregory's allegations that Virginia sexually abused him.[5] Both parents also admitted to neglect. Based on this evidence, and the undisputed fact that at the time DCYF filed the termination of parental rights petition, Rosalie and Gregory had been in the legal custody of DCYF for well over twelve months, the trial court found that DCYF had proven every element of § 15–7–7(a)(3). The trial justice then made a specific finding that the Houles were unfit.

Nevertheless, the Houles argue that the trial court erred by failing to make a finding of unfitness. This assertion obviously contradicts the record, and we do not afford it any value. The Houles also contend that the record is devoid of any evidence of parental unfitness, but our review of the record convinces us that legally competent evidence exists to support the trial justice's findings. Moreover, the trial justice was not clearly wrong and he did not misconceive or overlook material evidence. Therefore, we affirm the trial justice's finding of unfitness pursuant to § 15–7–7(a)(3).

Because we are satisfied that the trial justice was correct when he determined that there was sufficient evidence to establish unfitness under § 15–7–7(a)(3), we

---

**5.** The trial justice said that "the allegations of abuse, initially against Mr. Houle, and later involving both parents, are serious and must be addressed before the children can be discharged from foster care."

need not turn to an exhaustive discussion regarding abandonment. On the basis of the record before us, however, we are satisfied that there is sufficient evidence to support the trial justice's finding of abandonment.

## II

### Freedom From Self–Incrimination

■ We now address the Houles' argument that the Family Court violated the Fifth Amendment to the United States Constitution [6] and article 1, section 13, of the Rhode Island Constitution [7] by basing its finding of unfitness upon the Houles' refusal to accept reunification services. The Houles strenuously maintain that they did not participate in DCYF's case plans because doing so would have subjected them to potential criminal liability. Specifically, they argue that the initial case plan required Peter to admit to abusing former foster children and to accept services "that were calculated to cause [the Houles] great legal discomfort." Moreover, the Houles urge that the trial justice effectively expropriated Peter's Fifth Amendment privilege against self-incrimination by using his invocation of that privilege against him in the termination of parental rights proceeding. We do not agree.

■ The Fifth Amendment privilege against self-incrimination "may properly be invoked in a civil proceeding regardless of whether there is a pending criminal matter arising out of the same set of factual circumstances." *Tona, Inc. v. Evans,* 590 A.2d 873, 875 (R.I.1991). However, the privilege applies only when a party is " 'compelled to make a *testimonial* communication that is incriminating.' " *Id.* In addition, " 'the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify.' " *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 390 (7th Cir.1995). Rather, a party's silence should be considered in light of all the other evidence. *Id.*

Here, the Houles argue that they were entitled, pursuant to the Fifth Amendment, to refuse all DCYF services aimed at reunification because their participation might have incriminated them. They also argue that the trial justice should not have drawn any negative inferences about their fitness as parents as a result of this blanket refusal. These arguments do not pass muster in light of our case law in this area.

■ In *Tona,* we explained that there are limitations on the right to invoke the Fifth Amendment privilege. *Tona, Inc.,* 590 A.2d at 876. Specifically, we held that whether the privilege applies in a particular context "must be determined by the court on a question-by-question basis." *Id.* Moreover, "[t]he mere threat of criminal prosecution is insufficient to justify a blanket assertion of the Fifth Amendment privilege." *Id.* Here, the Houles refused to participate in every case plan that DCYF prepared. They argue that Peter could not participate in counseling because "any response could have been injurious." However, the issue of whether the Fifth Amendment privilege applied in this matter was not for the Houles to decide. Rather, it was for the Family Court to determine "after conducting 'a particularized inquiry, deciding, in connection with each specific area that the questioning par-

6. The relevant portion of the Fifth Amendment to the United States Constitution reads as follows: "No person * * * shall be compelled in any criminal case to be a witness against himself."

7. Article 1, section 13, of the Rhode Island Constitution states: "No person in a court of common law shall be compelled to give self-criminating evidence."

ty seeks to explore, whether or not the privilege is well-founded.'" *Tona, Inc.*, 590 A.2d at 876 (quoting *S.E.C. v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 668 (5th Cir.1981)).

Moreover, there is no evidence in the record to suggest that the trial justice inferred, on the basis of Peter's nonparticipation in offender counseling alone, that the Houles were unfit parents. Rather, the trial justice drew upon an abundance of evidence, including Gregory's statements that he was abused by Virginia, the admissions of both parents that they no longer desired to reunite with Rosalie, Virginia's misconduct during visitation with the children, evaluations of the children by Marge Lederer[8] and Doctor John Parsons,[9] as well as both parents' hostility toward DCYF and their wholesale refusal to participate in any reunification services, even after Peter was acquitted of the sexual abuse charges. It was entirely proper for the trial justice to draw inferences based upon the Houles' refusal to participate in reunification, in light of all the other evidence that supported the court's finding.

In addition, we recently decided a termination of parental rights appeal in which a father, who was found to be unfit, argued that the trial justice should not have considered his failure to partake of sexual offender counseling because he was, at the same time, defending himself against sexual misconduct charges in another case. *In re Amber P.*, 877 A.2d 608 (R.I.2005). We disagreed, recognizing "that a situation such as this can place a litigant such as respondent on the horns of a dilemma. However, that dilemma in no way should

preclude the Family Court from carrying out its statutory duty of determining both parental fitness and what is in the best interest of a child." *Id.* at 616. Ultimately, we held that the trial justice was "entitled to weigh * * * respondent's failure to submit to sex-offender counseling, in the court's consideration of DCYF's termination petition." *Id.*

 Likewise, in *In re Alan W.*, 665 A.2d 877 (R.I.1995), we affirmed the termination of parental rights of a father who was charged by DCYF with sexually abusing his son. The father, who already was serving prison time for sexual assaults on other children, denied allegations that he abused his son. *Id.* On appeal, he argued that DCYF did not provide him with a fair opportunity to reunite with his child. *Id.* at 878. In affirming the Family Court's decision, we noted the trial justice's observation that "the father had apparently concluded that it was not in his own best interests to admit to the abuse and begin therapy months earlier while awaiting trial. In doing so * * * the father put his own interests before those of his son, who had been in foster care for almost two years." *Id.* The purpose of a termination of parental rights proceeding "is to determine whether the parent has manifested, despite the child's placement out of the home, the sense of responsibility, interest and affection essential to the reestablishment of parental care for the child." *In re Armand*, 433 A.2d 957, 961 (R.I.1981).

From the inception of DCYF's involvement in this case, Peter and Virginia Houle have stonewalled virtually all attempts at reunification. They argue that

8. Marge Lederer is an independent licensed clinical social worker and clinician at St. Mary's Home, a therapeutic residential home for children who have been severely neglected or sexually or physically abused.

9. Doctor John Parsons was qualified as an expert in clinical psychology, and testified at trial about his psychological assessment of Gregory.

any participation in DCYF case plans will subject them to criminal liability. Such a wholesale rejection of the services provided to them, while their children remained in DCYF custody for over two years, demonstrates that the Houles exalted their own interests over those of their children. The Houles have failed to evince the "responsibility, interest, and affection" that we deemed "essential to the reestablishment of parental care." After reviewing the record and our case law in this area, we conclude that the trial justice did not infringe upon the Houles' right against self-incrimination.

## III

### DCYF's Efforts to Reunify

■ The Houles argue that DCYF did not make reasonable efforts to reunify their family as required by § 15-7-7(a)(3). It is well settled that "reasonable efforts at reunification must always be made by DC[Y]F before there is a termination of parental rights, * * * [however] such a subjective term must be defined by the particular facts and circumstances of each case." *In re Kristen B.*, 558 A.2d at 203. The Houles argue that DCYF's efforts were not reasonable in this case because their participation in the services provided would have "most certainly sealed a criminal conviction." We reject this contention.

In his decision, the trial justice said:

"The allegations of abuse, initially against Mr. Houle, and later involving both parents, are serious and must be addressed before the children can be discharged from foster care. The resolution of criminal charges alone would not resolve the pending civil matters. The DCYF offered evaluations and treatment to address the issues that led to the opening of their case and the placement of the children. The Houles' refusal to engage in the evaluations and

any recommended treatment is the sole cause of the lack of success in reunifying this family."

In *In re Kristen B.*, a child alleged that her parents sexually abused her, and she subsequently was placed in protective custody. The parents denied the allegations and did not cooperate with therapy. We upheld the Family Court's finding that the state agency made reasonable efforts at reunification and explained that "both parents' constant denial of any sexual abuse problem and their uncooperative attitudes within group sessions cannot be excused. Their lack of cooperation is particularly indefensible in light of the fact that each parent knew this therapy was the only avenue available to achieve reunification." *In re Kristen B.*, 558 A.2d at 204.

■ Here, the trial justice found, and the evidence supports, that the Houles had no interest in cooperating with DCYF to achieve reunification. Their argument that they did not cooperate because doing so would subject them to criminal liability appears to be no more than a smoke screen. First, DCYF modified their case plans by calling for services after the resolution of Peter's criminal case, yet the Houles refused to sign these plans as well. Secondly, the Houles refused to take any steps toward reunification even after the criminal case concluded. As we have said repeatedly, this Court does not expect the impossible from the various agencies that deal with child protection and placement. *In re Ann Marie*, 461 A.2d 394, 395 (R.I. 1983). Nor do we desire to "burden the agency with the additional responsibility of holding the hand of a recalcitrant parent." *In re Kristen B.*, 558 A.2d at 204. The trial justice below considered the seriousness of the allegations of sexual abuse and the Houles' consistent failure to cooperate with DCYF in its efforts to achieve reunifi-

cation, and he concluded that DCYF had fulfilled its obligation to make reasonable efforts at reunification in this case. The record contains ample evidence to support the trial justice's finding. Moreover, the trial justice was not clearly wrong and did not misconceive or overlook material evidence.

## IV

### Denial of Visitation

■■■■■ We now turn to the Houles' final argument, that the state violated their constitutional due process rights by precluding them from visiting with their children and then filing a petition for termination of parental rights on grounds of abandonment. It is well settled that in addition to DCYF's obligation to make reasonable efforts at reunification, parents have a concomitant responsibility " 'to formulate, and act to accomplish, a feasible and realistic plan' " for the future of their children. *In re Armand,* 433 A.2d at 961. Moreover, "it is incumbent upon the parent, and not DCYF, to make efforts to see his or her child." *In re Unique T.,* 822 A.2d 182, 183–84 (R.I.2003).

In *In re Damien M.,* 819 A.2d 213 (R.I. 2003) (mem.), the Family Court terminated a father's parental rights when it found that he had abandoned his son. The father argued that he made only sporadic attempts to visit his son because he did not want to violate a no-contact order with the child's mother. *Id.* at 214. On appeal, this Court noted that despite the order, the father "never made any attempts to file a motion to seek visitation with his son." *Id.* We concluded that "the father's actions spoke louder than his words regarding his intention to develop a relationship with his son." *Id.*

Similarly, the Houles claim that they did not visit their children because they were denied such rights. In fact, DCYF initially permitted Virginia to reside with and care for her children. However, that arrangement was terminated when she violated a court order prohibiting her from allowing the children to have contact with Peter. Nevertheless, DCYF coordinated supervised visits between the children and their mother. But, during these visits Virginia often was hostile and attempted to discuss legal matters with the children. As a result, the children's therapist opined that the visits no longer were in the children's best interests. The record shows that it was Virginia's own conduct that caused DCYF to suspend visitation.

Peter has been denied visitation since his arraignment for criminal charges on May 26, 1999.[10] The trial justice found that "the father's unwillingness to address the abuse allegations against him" is what caused him to be unable to have contact with the children. The Family Court also stated that "the parents knowingly and willfully elected to put the criminal defense of Mr. Houle as paramount to the interests of their children. They cannot now complain that their lack of contact was not their own doing." As we held in *In re Unique T.,* 822 A.2d at 184, "it is not the fact of incarceration that constitutes abandonment, but rather the fact that a parent has not 'actively engaged in efforts to contact that child, despite having opportunities to do so.' " Here, both parents had opportunities to address the situation that caused their children to be placed in the protective custody of the DCYF. Their own conduct, however, undermined the possibility of seeing their children. Therefore, the Houles' argument that a finding of abandonment constituted a denial of their due process rights must fail.

---

10. The record reveals that Peter and Virginia made a motion for visitation in March 2001.

## Conclusion

In light of the foregoing, we affirm the Family Court judgment terminating Peter and Virginia Houles' parental rights. The record shall be returned to the Family Court.