**Supreme Court**

No. 2014-38-Appeal.
(02-2163-6)

In re Jah-nell B.             :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Jah-nell B.                              :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**   The respondent, Clifton Barr, appeals from a decree entered in Family Court terminating his parental rights to his son, Jah-nell.  This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument.  For the reasons set forth in this opinion, we affirm the decree of the Family Court.

**I**

**Facts and Procedural History**

Jah-nell and his family came to the attention of the Department of Children, Youth and Families (DCYF) in April 2009 when the DCYF hotline received a call concerning his mother's "unstable" behavior.  In particular, there were allegations that Jah-nell's mother had hit another person's child.  Due to safety concerns, DCYF formally opened a case and assigned a social caseworker, Aleida Mohammed, to the family on April 24, 2009.

On May 19, 2009, a Family Court justice ordered the removal of Jah-nell who was then living with his mother.  Jah-nell was placed in the care and custody of DCYF and then situated in

- 1 -

a nonrelative foster home. At the outset of this case, respondent was identified as the biological father of Jah-nell. The respondent came into court on September 2, 2009, and admitted to allegations of neglect. At that time, he was incarcerated at the Adult Correctional Institutions (ACI). From Jah-nell's birth in January of 2008 until the time of trial in May and June of 2013, respondent had spent nearly two of the five years of his son's young life in prison.

On January 30, 2012, DCYF filed a petition in Family Court seeking to terminate the parental rights (TPR) of both Jah-nell's mother and father. The TPR petition alleged, in wording substantially similar to the statutory language in G.L. 1956 § 15-7-7(a)(3), that:

> "The child has been placed in the legal custody of the Department of Children, Youth and Families for at least twelve (12) months; and the parents were offered or received services to correct the situation which led to the child being placed and provided further that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home."

A trial in Family Court was held over six days in May and June of 2013, during which extensive trial testimony was provided by twelve witnesses.[1]

Ms. Mohammed testified as to the circumstances present that gave rise to serious concerns regarding the safety and well-being of Jah-nell and his siblings. In particular, she testified that her trepidation stemmed from the actions of the child's mother and concerns about "[i]nappropriate parenting, substance abuse, domestic violence, unstable mental health, [and] putting the needs of her boyfriend before her children." With respect to respondent, Ms. Mohammed testified that visits between Jah-nell and respondent at the ACI were ordered by the

---

[1] The trial in the Family Court pertained to the termination of the parental rights of both the mother and respondent with respect to Jah-nell, in addition to the mother's parental rights to two of her other children by another father. This opinion will address only the portions of the proceedings below that are relevant to respondent's appeal from the termination of his parental rights to Jah-nell.

Family Court. She stated that respondent did not request any visits until October 2009. He completed two visits with his son—one on October 20, 2009 and one on November 30, 2009. At the October visit, Ms. Mohammed was present and observed that Jah-nell "did not know who [respondent] was." Nevertheless, on cross-examination, Ms. Mohammed testified that respondent "tried his very best to get [Jah-nell] to interact with him [and] to play" with him during the first visit. She explained that she did not set up additional visits for respondent at the time because he had told her "that he was going to be released in December or January, so he would wait for his next visit for when he was released." Ms. Mohammed testified that she called the ACI in January, but was informed that "[respondent] was in disciplinary and was not allowed to have visitation at the time."

The respondent was released from the ACI in March 2010. Following his release, Ms. Mohammed received a call from him and scheduled a visit for him with Jah-nell on March 24, 2010. The visits between respondent and Jah-nell were intended to occur on a biweekly, or once every other week, basis. However, Ms. Mohammed detailed in her testimony the numerous occasions on which these visits did not take place. She testified that respondent canceled visits on May 7, May 21, and July 30, 2010, and failed to show up for a scheduled visit on September 22, 2010. Ms. Mohammed described the reason that respondent offered for not attending the last scheduled visit as "housing problems." More specifically, she indicated that he was not "getting along with [the] roommate" with whom he had been court-ordered to live. She testified that, even though respondent had been ordered to live at an address in Woonsocket as "part of his probation parole [sic]," he instead had moved in with his girlfriend. On September 29, 2010, Ms. Mohammed received a phone call from respondent's girlfriend, after which Ms. Mohammed requested a bureau of criminal investigation (BCI) check on respondent. The BCI check notified

her that respondent was again incarcerated at the ACI. Ms. Mohammed testified that she believed he was incarcerated from September 2010 until March 2011 and that at no point during that time period did he contact her to request visits with Jah-nell.[2]

Visitations were re-established after respondent's release from the ACI, but Ms. Mohammed described them as "sporadic," stating that: "[h]e would be consistent and then disappear, and then he would call back and said [sic] that he left town for a couple of months and then he would start up again." After respondent failed to make contact in December 2012, she determined that he had been incarcerated again.

In accordance with departmental procedures, Ms. Mohammed prepared three case plans for respondent with a goal of reunifying him with Jah-nell. The first case plan prepared for respondent was dated May 17, 2010; the second plan was dated January 1, 2011; and the third plan was dated October 13, 2011. The core objectives provided in respondent's case plans included: "Complete a parent-child evaluation, maintain employment so he could save money to obtain a two-bedroom apartment for he [sic] and his son, complete a substance-abuse evaluation, cooperate with conditions of parole and probation, [and] complete services with Early Intervention." She further testified that in October 2011 respondent eventually completed a substance-abuse evaluation, which indicated that he "was in full remission, according to the counselor." As a result, no further substance-abuse services were recommended.

Ms. Mohammed stated in her testimony that respondent had told her that he wanted Jah-nell to be reunified with Jah-nell's mother. Further, she explained that "[respondent] stated to me that if the mother was not able to reunify, then he would make efforts to try to reunify with

---

[2] During this time period, DCYF made no efforts to contact respondent to schedule visits with Jah-nell. At trial, Ms. Mohammed indicated that this was due to the entry of a decree on May 19, 2010 in the Family Court, ordering DCYF to file a petition for the termination of parental rights (TPR) if the "parents do not cooperate with services."

his son, but he was hopeful that she would get his son back." When respondent testified, he denied that he had said the best place for Jah-nell would be with his mother. He indicated that he did not intend for his son to be with his mother, explaining: "I don't think that it's good to take five kids, put one and take the other. If she's -- if they don't want her to have kids, I don't think my kid is safe. For the same reason, no other kids are safe there."

When respondent took the stand at trial, he indicated that he did not currently have a permanent address and that he lived with his cousin. He was employed doing construction work in Boston at the time of the trial. With regard to Jah-nell, respondent stated that he had never lived with his son and never paid any support to Jah-nell's mother. In 2009, when DCYF became involved with his family, respondent was serving a prison sentence on a September 2007 conviction for the delivery of a controlled substance.[3] Although he could not recall the specific dates, he conceded that he spent about one month in segregation at the ACI while serving that sentence. He testified that, after his first release in March 2010, he met with Ms. Mohammed to discuss a case plan for him to reunify with Jah-nell. In the course of that discussion, respondent indicated that Ms. Mohammed asked him to complete a substance-abuse evaluation and a parent-child evaluation. In September 2010, respondent was re-incarcerated at the ACI for violating the terms of his probation. Following his release in March 2011, respondent moved in with his girlfriend in Lincoln.

With regard to Jah-nell and their visits, respondent testified that: "I'm getting left behind everybody, and I'm the biological dad." He explained that he felt Jah-nell was "trying to learn a

---

[3] With regard to respondent's criminal history, he was convicted of possession with intent to deliver a controlled substance on September 21, 2007 and he was sentenced to fifteen years, with fifty-four months to serve, and 126 months suspended. At the time DCYF opened this case in 2009, respondent was already serving this sentence at the ACI and was subsequently released in March 2010. In September 2010, respondent was again incarcerated at the ACI for a probation violation. He was released in March 2011.

foster father, [his mother's] boyfriend, who is supposed to be a father, and then me at the end of the chain." The respondent indicated that if the court reunified him with Jah-nell, then his "plan would be to get a job, get an apartment, everything they wanted me to do when it started basically." When asked if he needed any assistance from DCYF to help reunify with his son, respondent replied "[a]nything further than guidance, I would say no."

At the request of DCYF, Dr. John P. Parsons, Ph.D., a licensed clinical psychologist, was engaged to perform "a comprehensive psychological evaluation and parenting assessment" of respondent. Ms. Mohammed testified that she set up the parent-child evaluation for respondent around September 2010. Doctor Parsons testified that it typically takes five sessions to complete his psychological evaluation of the parent and one interactive session with the parent and child to complete the parenting assessment. Nevertheless, in respondent's case, Dr. Parsons never completed the overall assessment because respondent failed to participate in the final interactive session during which Dr. Parsons would have observed him with Jah-nell. Doctor Parsons testified that respondent was "cooperative" during his first five visits. The respondent was re-incarcerated during the evaluation process, which required Dr. Parsons to reschedule his final observation. After respondent's release, DCYF again referred respondent to Dr. Parsons. Despite meeting with Dr. Parsons on ten occasions,[4] respondent never completed his final interactive session.

Doctor Parsons explained at trial that he utilized "a standard battery of psychological tests and inventories" in his evaluations. He testified that he received a case history from Ms. Mohammed prior to administering the tests and conducting his evaluations of respondent.

_____

[4] At trial, the parties stipulated to all of the dates on which respondent met with Dr. Parsons. The dates of those sessions were: August 2, 2010, August 6, 2010, August 11, 2010, August 18, 2010, September 1, 2010, February 6, 2012, February 22, 2012, February 24, 2012, February 29, 2012, and March 2, 2012.

Based upon the tests and evaluations he administered, Dr. Parsons assessed respondent's cognitive abilities and mental health status. In addition, Dr. Parsons explained that, although respondent had self-reported at an evaluation in 2012 that he was no longer abusing marijuana, he nonetheless "gave him a diagnosis of cannabis dependence in sustained full remission, which meant that he hasn't smoked the substance in over a year."

Doctor Parsons also described some of the difficulties that he and Ms. Mohammed encountered in terms of communicating with respondent to schedule a date and time for the parent-child evaluation. The respondent elaborated in his testimony that at first it was a "date thing" that precluded them from scheduling the interactive visit. However, respondent further testified that once he learned of what the visit would entail, then "I really didn't want to do the visits either way. I didn't want to do the visit with Dr. Parsons and my son." He also indicated that he felt the evaluation would not be a "fair situation" for him.

Although the final parent-child evaluation never occurred, Dr. Parsons nevertheless filed a report with his findings, based on a reasonable degree of "psychological certainty," after concluding his psychological evaluation of respondent. Based on twenty-five factors, Dr. Parsons determined that, at the time he finalized his evaluations in June 2012, reunification of respondent and Jah-nell was a "high-risk situation." Doctor Parsons proceeded to highlight some of these factors, such as: (1) his failure to be cooperative with and complete the parent-child evaluation; (2) his history of substance abuse; (3) his difficult family circumstances; (4) his record of incarceration; and (5) his mental health issues. In his report, Dr. Parsons did not make

any recommendations of services to be provided to respondent.[5]  He explained his reasoning behind that decision, testifying:

> "We were talking about a child who needed a stable environment. We were talking about a child that went into care angry, developmentally-delayed, was placed in this foster home and improved significantly.
> "* * *
> "But at that point, I felt what's in the best interests of this child, permanency planning with someone, other than [respondent], was to be provided."

While discussing his findings, Dr. Parsons did note that he "do[esn't] doubt that [respondent] loves his boy, that he cares about him."  However, Dr. Parsons concluded by testifying: "I felt with a combination of these factors and the amount of time, the length of time this child was in care, that it was a high-risk situation."

On October 17, 2013, the trial justice issued a comprehensive written decision, spanning eighty-three pages, in which he concluded that respondent's parental rights to Jah-nell be terminated.  In that decision, the trial justice conducted an in-depth review of all of the testimony provided over the six-day trial, reviewed portions of the exhibits in evidence, and rendered sixty-five findings of fact.  He found that respondent was unfit because he had been unable to complete the objectives of his case plans, which DCYF had tailored in an effort to address the pertinent issues in this case.  The trial justice then went on to find that "DCYF has in fact made more than reasonable efforts to reunify [Jah-nell] with [respondent]."  Despite DCYF's efforts, he concluded that "[t]here is not a substantial probability that [Jah-nell] will be able to return

---

[5] It came up at trial that Dr. Parsons in his report had erroneously noted that, on May 19, 2010, DCYF had already filed a TPR petition for respondent.  In his testimony, Dr. Parsons denied that this error had any effect on the conclusions set forth in his report.  Doctor Parsons's report was dated June 10, 2012.  DCYF had filed its TPR petition for respondent in January 2012.

safely to [respondent's] care within a reasonable period of time considering [Jah-nell's] age[] and [his] need for a permanent home."

The trial justice concluded that it was in the best interest of Jah-nell to terminate the parental rights of respondent. In reaching that conclusion, he found the expert testimony of Dr. Parsons to be "credible and probative on the issue of potential reunification of Jah-nell with the father." Furthermore, he credited many of the twenty-five factors that Dr. Parsons had relied upon in concluding that reunifying Jah-nell with respondent was a "high-risk situation." In particular, he noted:

> "62. Among the factors were the father's lack of cooperation with the evaluation; he did not complete the evaluation; he was estranged from his family members; he had numerous arrests, both as a juvenile and as an adult; he wasn't working; he didn't have the means to support himself or his family; he has five children and wasn't paying child support; he had a substance abuse history and his mental health issues."

The trial justice found that since Jah-nell had been placed with a foster family, "the child's behavior and learning abilities improved significantly." In his decision, the trial justice noted that he "[gave] substantial consideration to the physical, psychological, mental, and intellectual needs of [Jah-nell] and [his] need for permanency in [his life]."

Ultimately, he determined that: "The [c]ourt finds that it is in the best interest of [Jah-nell] to be granted permanency in [his life] in appropriate pre-adoptive foster placement and that the rights of [respondent] be terminated." The trial justice terminated respondent's parental rights to his son in accordance with § 15-7-7(a)(1), (3), and (4). The decree terminating respondent's parental rights to Jah-nell was entered on October 24, 2013. The respondent filed a timely notice of appeal.

- 9 -

## II

## Standard of Review

"This Court, on appeal, will review a trial justice's ruling on a termination of parental rights with an examination of the record to ascertain whether legal and competent evidence lend support to his or her findings." In re Evelyn C., 68 A.3d 70, 77 (R.I. 2013). In conducting this review, "a trial justice's findings are entitled to great weight and will not be overturned unless we determine that they 'are clearly wrong or the trial justice overlooked or misconceived material evidence.'" Id. (quoting In re Amiah P., 54 A.3d 446, 451 (R.I. 2012)).

When confronted with a termination of parental rights, "we remain keenly mindful that natural parents have a fundamental liberty interest in the care, custody, and management of their children." In re Isabella M., 66 A.3d 825, 830 (R.I. 2013) (quoting In re Steven D., 23 A.3d 1138, 1154 (R.I. 2011)). "[I]n order to permanently sever the rights of a parent in his or her children, the trial justice must make a determination that the parent is unfit and [t]he state must prove parental unfitness by clear and convincing evidence in order to satisfy the parent's right to due process." Id. (quoting In re Alexis L., 972 A.2d 159, 165 (R.I. 2009)). "However, '[u]pon a determination of parental unfitness, the best interests of the child outweigh all other considerations.'" Id. (quoting In re Dayvon G., 10 A.3d 448, 454 (R.I. 2010)).

## III

## Discussion

The grounds upon which a Family Court justice may rely for the termination of parental rights are set forth in § 15-7-7. The trial justice terminated respondent's parental rights to Jah-nell pursuant to § 15-7-7(a)(1) (willful neglect), § 15-7-7(a)(3) (lack of substantial probability of child's return), and § 15-7-7(a)(4) (lack of contact). On appeal, respondent contends that the

record in this case failed to evince the clear and convincing evidence required to support the trial justice's findings of parental unfitness and reasonable efforts at reunification on the part of DCYF. We address each argument in turn.

## A

### Finding of Parental Unfitness

As stated by the United States Supreme Court, and echoed by this Court, "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." In re Kristina L., 520 A.2d 574, 579 (R.I. 1987) (quoting Stanley v. Illinois, 405 U.S. 645, 651 (1972)). "It is well settled that a finding of unfitness must be made before the Family Court may terminate parental rights." In re Rosalie H., 889 A.2d 199, 204 (R.I. 2006). This Court has established that, "[a]bsent a finding of unfitness, the natural parent[s'] right to bear and raise their child in a less than perfect way remains superior to the rights of foster parents who may be exemplary nurturers." Id. (quoting In re Amber P., 877 A.2d 608, 615 (R.I. 2005)). On appeal, respondent argues that the trial justice erred in finding that he was unfit because clear and convincing evidence of his parental unfitness was "absent from the record." We see no merit in this contention.

The trial justice found respondent unfit pursuant to § 15-7-7(a)(1), (3), and (4). With respect to § 15-7-7(a)(1), he stated that: "the father is unfit by reason of his willful neglect to provid[e] proper care and maintenance of his child for a period of at least one year where financially able to do so." He further concluded, that in accordance with § 15-7-7(a)(3), "there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home."

Finally, the trial justice terminated respondent's parental rights under § 15-7-7(a)(4) declaring that respondent "has not had, nor has he sought, contact with the child for a period in excess of six (6) months."[6]

Our case law clearly establishes that a parent whose child is in the care and custody of DCYF has the obligation: "(1) to maintain contact with the child and (2) to plan for the child's future." In re Rosalie H., 889 A.2d at 205 (quoting In re Kristen B., 558 A.2d 200, 204 (R.I. 1989)). When a parent in this position demonstrates an unwillingness to cooperate with DCYF services, we have recognized that lack of interest as grounds for a finding of parental unfitness. Id.; see In re Robert S., 840 A.2d 1146, 1149 (R.I. 2004) (relying on evidence of the respondent's failure to comply with his two case plans as demonstrating an overall lack of interest in the children to support the trial justice's finding of parental unfitness).

In this case, respondent testified that he has never provided any financial support to Jah-nell. He also acknowledged that at no point had Jah-nell lived with him. The extensive record in this case reveals that respondent made only inconsistent and limited attempts to visit with his son, both while he was incarcerated and while at liberty. His last contact with Jah-nell was in November 2012. Moreover, respondent's repeated incarcerations made completion of the tasks outlined in the case plans, and ultimately reunification, far more difficult.

As we have previously stated, "[w]hen planning for reunification with a child, the parent not only should establish and comply with a plan that can provide a sound and constructive family life but must also perform some minimal act toward the fulfillment of that plan." In re Kristen B., 558 A.2d at 204. At trial, respondent offered little in terms of future plans should he be reunified with his son.

---

[6] Although the trial justice articulated subsections (1), (3), and (4) of G.L. 1956 § 15-7-7(a) as distinct grounds for termination, we recognize that the TPR petition alleged only § 15-7-7(a)(3).

Although we commend respondent for securing employment, we note that, at the time of trial, he had not established a permanent address for potential reunification with his son and had failed to abide by his probation conditions on one occasion. Moreover, he indicated his reticence towards any assistance from DCYF by expressing his desire for them to instead give him a "clean slate" so that he could have a "fair shot" with his son. In this case, respondent's various case plans for reunification also required the completion of a parent-child evaluation by Dr. Parsons. However, completion of this very attainable objective eluded respondent. The respondent testified with regard to the evaluation: "I'm in an uncomfortable situation trying to learn how to do something, and I feel I'm being graded and judged by what they put me to do and use it against me like that." Such expressed discomfort or displeasure with the evaluation, however, is not a justified basis for circumvention. See In re Kristen B., 558 A.2d at 204.

In recognition of Jah-nell's need for a permanent and nurturing home, the trial justice concluded that respondent was unfit to parent Jah-nell. Despite respondent's contention that the record is devoid of sufficient evidence of parental unfitness, our review of the record convinces us that legally competent evidence exists to support the trial justice's findings. Therefore, we affirm the trial justice's findings of parental unfitness.

**B**

**Reasonable Efforts at Reunification**

The respondent asserts that the state failed to prove that DCYF made reasonable efforts to reunify him with his son prior to filing the petition to terminate his parental rights. In particular, he contends that DCYF's reunification efforts were insufficient because these efforts "merely consisted of two evaluations and inadequate visitation." We disagree.

When a petition to terminate parental rights is filed pursuant to § 15-7-7, and before a parent's rights can be terminated, "DCYF must prove by 'clear and convincing evidence that regardless of the parent's behavior, [DCYF] has made reasonable efforts to encourage and strengthen the parental relationship' * * *." In re Alvia K., 909 A.2d 498, 504 (R.I. 2006) (quoting In re Amber P., 877 A.2d at 618). To satisfy this burden, we have never required DCYF to establish that it made "extraordinary efforts to reunite parent and child[.]" In re Lauren B., 78 A.3d 752, 760 (R.I. 2013) (quoting In re Jose Luis R.H., 968 A.2d 875, 882 (R.I. 2009)). Instead, this Court has previously stated that "the concept of reasonable efforts is not a rigid standard, but one of some flexibility that must be defined by the particular facts and circumstances in a case." In re Alvia K., 909 A.2d at 504 (quoting In re Amber P., 877 A.2d at 618). Furthermore, in conducting our review, we employ the same deferential standard of review with respect to the findings of the trial justice concerning reasonable efforts as we apply to findings of unfitness. Id.

In his written decision, the trial justice specifically found that DCYF "made more than reasonable efforts to reunify [Jah-nell] with [respondent]." After our review of the record, we are satisfied that there is ample evidentiary support for the trial justice's finding. From the outset of DCYF's involvement in this case, Ms. Mohammed chronicled her efforts on behalf of the agency to establish a consistent, bi-weekly visitation schedule for respondent and Jah-nell. Despite these efforts, respondent's visitation track record was replete with cancellations, absences, and extended gaps due to either incarceration or lack of communication. Accordingly, we disagree with respondent's contention that DCYF's visitation efforts were, in any way, "inadequate."

In addition to visitation, Ms. Mohammed testified that she had prepared three separate case plans for the respondent in an effort to reunify him with his son. Those plans, admitted into evidence at trial, contained objectives that the respondent failed to complete, which included participating in a parent-child evaluation, securing a permanent address, and abiding by his probation conditions. It is apparent from the respondent's testimony that he had repeated opportunities to complete the parent-child evaluation with Dr. Parsons. However, the respondent willfully declined to do so. He so indicated at trial, when he stated that "[b]y the time I knew what they were doing in there, I really didn't want to do the visits either way. I didn't want to do the visit with Dr. Parsons and my son." Furthermore, he expressed his frustration with the nature of the proposed evaluation, saying that it did not constitute "a fair situation." As this Court has often stated, we do not "desire to 'burden the agency with the additional responsibility of holding the hand of a recalcitrant parent.'" In re Rosalie H., 889 A.2d at 208 (quoting In re Kristen B., 558 A.2d at 204). Therefore, we are convinced that the record supports the trial justice's finding that DCYF provided reasonable efforts at reunification, and that, notwithstanding such efforts, there was not a reasonable probability that Jah-nell would be able to be reunified within a reasonable period of time.

## IV

## Conclusion

For the reasons stated herein, we affirm the decree of the Family Court terminating the parental rights of the respondent. The record of this case shall be returned to the Family Court.



**TITLE OF CASE:**        In re Jah-nell B.

**CASE NO:**        No. 2014-38-Appeal.
                              (02-2163-6)

**COURT:**        Supreme Court

**DATE OPINION FILED:**  June 17, 2015

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**    Providence County Family Court

**JUDGE FROM LOWER COURT**:

                              Associate Justice Howard I. Lipsey

**ATTORNEYS ON APPEAL:**

                              For Petitioner:  Karen A. Clark
                                            Department of Children Youth and Families

                                            Andrew J. Johnson
                                            Court Appointed Special Advocate

                              For Respondent:  Catherine Gibran
                                            Office of the Public Defender