**Supreme Court**

No. 2015-217-Appeal.
(06-663-1)

In re Livia B.L.               :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Livia B.L.                    :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.**  The respondent, Anthony Bucci (respondent or Bucci),

appeals from an order terminating his parental rights based on the abandonment of his daughter,

Livia, and from the granting of Derek Gray's petition to adopt her.  This matter came before the

Supreme Court on November 30, 2016, pursuant to an order directing the parties to appear and

show cause why this Court should not summarily decide the issues raised by this appeal.  After

hearing the arguments of counsel and reviewing the memoranda of the parties, we are satisfied

that cause has not been shown.  Thus, we shall decide the matter without further briefing or

argument.  For the reasons set forth herein, we affirm the order of the Family Court.

**I**

**Facts and Travel**

Livia was born to Marissa Levesque[1] and respondent, Bucci, on April 28, 2004.  At the

time of Livia's birth, Levesque was seventeen years of age and respondent was twenty years of

age.  They were not married and lived in separate households.  On March 15, 2013, Levesque

and Gray filed a joint Family Court petition for the termination of respondent's parental rights

and for the adoption of Livia by Gray.  A trial on the matter took place on March 25, April 15,

and April 22, 2014.

---

[1] Although Marissa Levesque's married name is now Marissa Gray, we shall refer to her by her maiden name to avoid confusion.

Gray testified first. He stated that he lives with Levesque, Livia, and another daughter that he had with Levesque. He stated that he began dating Levesque in late 2008, he met Livia in early 2009, and they began living together in the spring of 2010. Gray testified that he married Levesque in September 2012. He testified that he played a significant positive role in Livia's life as a father figure and that, since 2010, Livia has called him "Dad." Further, Gray stated that he supported Livia financially, which included setting up a college fund for her. He believed the last time respondent saw Livia was in the spring of 2009. For all of these reasons, Gray and Levesque jointly filed a petition for Gray to adopt Livia pursuant to G.L. 1956 § 15-7-5(b).[2]

Levesque testified next. She confirmed that, from Livia's birth until she was five years old, Levesque's relationship with respondent was "on and off and when it was good for him." She stated that they would "get involved a bit, fall off, and [he would] do whatever was best for him and let [Livia] down and start over and repeat." Levesque also testified that, during Livia's life, respondent was incarcerated "[m]ore often than not," which impacted their relationship.

Levesque confirmed that significant Family Court activity occurred between her and respondent, including a restraining order she obtained against him, and visitation and child-support issues. Levesque testified that respondent did not partake in usual visitation, and it depended on "if [Levesque and respondent] were good." She stated that she always supervised visits because she felt it was necessary. She recalled a period in 2010 where a justice of the Family Court granted respondent supervised visitation, but she noted that only one such visit

---

[2] General Laws 1956 § 15-7-5(b) permits the filing of an adoption petition "when the petitioners are one of the natural parents of the child and his or her spouse * * * and the child is residing, at the time the petition is filed, with the petitioners * * * ." The purpose of this statute is to permit a stepparent to jointly "file an adoption petition and become a co-parent along with a natural, custodial parent." In re Abby D., 839 A.2d 1222, 1223 n.3 (R.I. 2004). "To do this, the stepparent * * * must obtain the consent of that natural, custodial parent. Pursuant to the statute, the custodial parent expresses this consent by joining the petition." Id. Thus, in filing an adoption petition with Gray, Levesque consented and supported Gray's desire to adopt Livia.

occurred.  She described this visit as "[p]robably one of the worst days of my life as a parent to see my child literally attached to my neck and my waist and would not get off me."[3]

Prior to the 2010 visit, Levesque stated that respondent's last visit with Livia was shortly after Christmas in 2009, during which visit respondent spent very little time with the child.  She described Livia's relationship with respondent at this point as "kind of awkward for her, but she knew who he was and * * * I always covered for him."  When asked whether respondent maintained regular contact with Livia prior to the 2009 visit, Levesque responded, "No."

Levesque also discussed child support.  She stated that although a child-support order was entered against respondent, he filed multiple motions to reduce it.  Moreover, she testified that neither respondent nor anyone on his behalf paid child support from 2005 until the day of her testimony in 2014.  She stated that, since the supervised visit in 2010, respondent had not moved for further visitation; however, he did move to modify the child support order in 2013.

On cross-examination, she testified that she periodically brought Livia to respondent's mother's house, where respondent resided in 2009.  She testified that respondent and Livia did not have a set visitation schedule, and she confirmed that she controlled whether or not to permit visitation.  When asked whether respondent ever gave Livia gifts, she stated, "At some point in Livia's life [respondent] has gotten her some clothing here and there when she was very little."  Levesque further testified that respondent's mother bought Livia gifts but "never gave [her] money or support in any way."

Further, Levesque testified that, although one supervised visit occurred, she could not recall how many were scheduled.  She testified about a letter that she sent to respondent in prison

---

[3] At oral argument, petitioners' attorney indicated that, after this visit, he filed an emergency motion to terminate or modify visitation; however, in light of the fact that respondent was incarcerated before the hearing date, the motion passed.

and his response to it. She stated that in the letter, she requested that he give up his rights to Livia, but she stated that respondent refused.

Next, respondent testified. He indicated that, at the time of his testimony, he was incarcerated at the Adult Correctional Institutions, serving an eight-year sentence as a result of a plea bargain for a robbery charge.[4] With respect to supervised visitation, respondent stated that he should have had ten visits, but only one occurred. He indicated that, since his incarceration, he unsuccessfully filed one visitation motion. Yet, he confirmed that he successfully filed a motion to suspend his child support, which was denied.

The respondent indicated that he was under a child-support order. When he was employed up until his incarceration in December of 2010, he stated, he paid support through the State of Rhode Island, which he said was deducted directly from his paychecks. The respondent indicated that, because he lacked funds since he was incarcerated, he had a support arrearage of approximately $18,000 and had an order to pay "$50 a week and arrears."[5] He also testified that he had a prison bank account, to which his mother added about $30 to $40 each week. He stated that he asked his mother to send Livia funds on his behalf; however, he stated, "[Levesque] would not accept it."

The respondent testified regarding his last visitation with Livia at the courthouse in 2010, and acknowledged that she did not want to see him. He stated that Levesque arrived at the visit with her father. He also noted that Livia initially was crying and appeared shy, but, "[S]he got back to normal, coloring, laughing, joking around." He stated that, during the visit, Livia called

---

[4] Although incarcerated at the time of trial, in his prebriefing statement filed with this Court, respondent indicated that he was paroled on July 26, 2015.

[5] The respondent's testimony regarding child support was far from a model of clarity. In earlier testimony, he indicated that he was not under a child-support order—just an agreement with Levesque to pay support. He also fluctuated as to the amount owed, stating at one point during trial that he owed "$40 a week."

him "Daddy." He testified that Levesque was court-ordered to provide him with ten visitations;[6] but he claimed that, despite showing up nine out of ten times, Levesque showed up only once.

The respondent testified that, since his incarceration on December 14, 2010, he had sent no more than five cards to Livia and two or three letters to Levesque inquiring about Livia. He stated that "[Levesque] responded to me with a letter speaking about [how she] wants me to sign my rights off to my daughter and now my daughter has a new father." He testified that he wrote to Levesque again eighteen months after he was incarcerated to "tell her [he] would be coming home soon and [he] would like to get the relationship back with [his] daughter * * * ." When asked to whom he addressed the cards, he stated that he sent them to Levesque's father's house. On cross-examination, he acknowledged that he did not make copies of the cards he purportedly sent to Livia.

He testified that, when he dated Levesque, he saw his daughter daily and "paid for everything." The respondent stated that, before he went to jail, he had a "very good" relationship with Livia. He introduced several photographs of Livia, his family, and himself, which depicted "good times." Importantly, however, respondent's attorney stipulated that all of the photographs were taken no later than 2009.

He testified that, before his most recent incarceration, he was sentenced once for sixty days and once for thirty days. He disagreed with Levesque's testimony that he had been incarcerated more often than not during Livia's childhood. In response to a question posed on direct examination, respondent testified that he made two or three motions for visitation during Livia's lifetime.

---

[6] At oral argument, respondent's attorney indicated that out of the ten visits ordered, five were scheduled prior to respondent's incarceration. In his prebriefing statement, respondent suggests that these visits were scheduled throughout November and December of 2010.

The respondent's mother (Livia's grandmother), Jean Bucci, testified next. She indicated that, at some point in the spring of 2010, her relationship with Livia ceased. She noted that before that point she could see Livia if her son and Levesque were together; otherwise, her access was limited. She testified that, although in 2009 she could bring Livia Christmas presents, Levesque would not allow visits with or presents from respondent. She also stated that she repeatedly inquired whether Levesque needed anything for Livia.

On April 22, 2014, the trial justice issued a bench decision terminating respondent's parental rights. The trial justice deemed respondent unfit based on abandonment grounds.[7] Further, the trial justice granted Gray's adoption petition, finding it in Livia's best interests. An order was entered terminating respondent's parental rights on March 31, 2015. The respondent timely appealed.

## II

### Standard of Review

On review of "a decree terminating parental rights, 'we remain keenly mindful that natural parents have a fundamental liberty interest in the care, custody, and management of their children.'" In re Jake G., 126 A.3d 450, 456 (R.I. 2015) (quoting In re Jah-nell B., 116 A.3d 784, 791 (R.I. 2015)). "This Court reviews the record to determine whether legal and competent evidence lends support to the trial justice's ruling." Id. To this end, we assign great weight to a trial justice's findings, which we will not overturn unless "clearly wrong or the trial justice overlooked or misconceived material evidence." Id. (quoting In re Jah-nell B., 116 A.3d at 791). Permanent severance of parental rights must be grounded in the trial justice's parental-unfitness

---

[7] Although the trial justice heard testimony for termination of parental rights on two grounds—failure to pay child support and abandonment—he deemed the abandonment issue determinative and therefore did not consider the failure to pay child support.

determination, which requires proof "by clear and convincing evidence in order to satisfy the parent's right to due process." Id. (quoting In re Jah-nell B., 116 A.3d at 791). Nevertheless, "upon a determination of parental unfitness, the best interests of the child outweigh all other considerations." Id. (quoting In re Jah-nell B., 116 A.3d at 791). With respect to the review of adoption petitions, § 15-7-5(b)(2) sets forth that "[t]he standard of proof in these cases shall be by clear and convincing evidence and the court shall give primary consideration to the physical, psychological, mental, and intellectual needs of the child * * * ."

### III

### Discussion

In determining whether the trial justice erred in finding that respondent abandoned his daughter, Livia, we are guided by § 15-7-7(a)(4), which provides for termination of parental rights where "[t]he parent has abandoned or deserted the child. A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion."

The respondent contends that because, in his view, he overcame the abandonment presumption, the trial justice erred in his finding.[8] Specifically, respondent argues that the trial justice based his determination "solely on proof of [respondent's] incarceration." The respondent further asserts that the trial justice ignored evidence of "[respondent's] pre-incarceration attempts to seek visitation with his daughter," "that [respondent] sent cards to Livia

---

[8] At the outset, we note that the trial justice also granted petitioners' adoption petition in his bench decision. Based on his review of the evidence, the trial justice was satisfied that granting the petition aligned with Livia's best interests. Specifically, he found that "petitioners [were] able to furnish [Livia] with suitable nurture, care and education having reference to the degree and condition of these parents * * * " and, therefore, deemed Livia "for all legal intents and purposes the child of" Gray and Levesque. Importantly, however, respondent does not press this issue on appeal, and thus we limit our discussion to the abandonment determination.

- 7 -

during his incarceration and that he made attempts to communicate with Livia through her mother," and of Levesque's lack of cooperation in facilitating visits. The respondent contends that the trial justice "completely overlooked [the aforementioned] testimony in reaching his decision."

We deem respondent's arguments unavailing. While we agree that more than incarceration is necessary to prove abandonment, here we are satisfied that legally competent evidence supported the trial justice's determination to the requisite clear and convincing evidence standard. He based his decision on "[his] assessment of the credibility of the witnesses, [his] weighing of the exhibits, and * * * the [c]ourt's belief of what is the most pertinent and relevant evidence * * * ." The trial justice found that "[t]he evidence [was] clear * * * that [respondent] has had no contact with Livia since November of 2010" and "[t]he only efforts [respondent has] made to have contact since that time is a motion [seeking visitation] filed in February of 2013."

Additionally, the trial justice noted that the Family Court clerk's office rejected that motion, after which respondent did not attempt to refile it. The trial justice noted that while the clerk's office rejected this single motion for visitation, respondent successfully filed at least two motions for relief from child support. He stated, "It's really a mystery to me why the visitation motion couldn't get on [the calendar] if the motion for relief could have gotten on, but it was not and [respondent] never tried again to have his motion for visitation heard." He also recalled pictures introduced of respondent, his family, the Levesque family, and Livia, which "look[ed] like there were a lot of good times." However, he emphasized that each picture related back to 2009 or earlier. The trial justice noted that respondent did not provide anything of "recent vintage." As such, the trial justice found that "[r]espondent has had no contact with the child

Livia since November of 2010 and that more than six months have elapsed since that time." Accordingly, the trial justice found that respondent abandoned Livia, and therefore, he terminated respondent's parental rights and granted the adoption petition.

This Court is not insensitive to "the 'drastic and irreversible' nature of a decree terminating parental rights * * * ." In re Max M., 116 A.3d 185, 193 (R.I. 2015) (quoting In re Steven D., 23 A.3d 1138, 1154 (R.I. 2011)). "[D]ue process requires that, before * * * a parent's rights in his or her children" are terminated, clear and convincing evidence must support the termination allegations. Id. (quoting In re Steven D., 23 A.3d at 1155). Nonetheless, "[t]he findings of fact made by a Family Court justice in this context are accorded great weight on appeal and will not be disturbed unless it can be shown that they are clearly wrong or the trial justice overlooked or misconceived material evidence." Id. (quoting In re Caleb W., 990 A.2d 1225, 1228 (R.I. 2010)). Our standard of great deference to the trial justice confines our determination to "whether any legally competent evidence exists to support the trial justice's findings." Id. (quoting In re Robert S., 840 A.2d 1146, 1149 (R.I. 2004)).

Although respondent correctly notes that the trial justice did not explicitly reference his testimony that he mailed Livia "no more than five" cards and sent Levesque letters, this is not akin to misconception or oversight, or otherwise clear error in the trial justice's decision. Indeed, "[w]e reject the suggestion that a trial justice must resolve every disputed factual contention that may arise during a trial." Notarantonio v. Notarantonio, 941 A.2d 138, 147 (R.I. 2008). "A trial justice need not 'categorically accept or reject each piece of evidence in his decision for this Court to uphold it because implicit in the trial justice[']s decision are sufficient findings of fact to support his rulings.'" Id. (quoting Narragansett Electric Co. v. Carbone, 898 A.2d 87, 102 (R.I. 2006)). We need not "refuse to accord the [trial justice's] decision the persuasive force usually

accorded such decisions on review" simply because the trial justice did not "expressly articulate findings of fact." Id. (quoting Mattera v. Mattera, 669 A.2d 538, 541 (R.I. 1996)). Here, respondent's argument is belied by the trial justice's factual finding in his order that respondent "has not made any reasonable effort to see or contact the child Livia since November of the year 2010." This finding suggests that, rather than misconception or oversight, the trial justice heard and disbelieved respondent, or otherwise found respondent's attempts at contact insufficient.

Further, this decision falls squarely within this Court's recognition that a parent's sporadic attempts to contact his or her child are inadequate to rebut a prima facie case of abandonment. See In re Serenity K., 891 A.2d 881, 884 (R.I. 2006) (characterizing evidence of the respondent's telephone calls as "meager attempts to maintain contact" insufficient to overcome abandonment finding); In re Ariel N., 892 A.2d 80, 86-87 (R.I. 2006) (affirming trial justice's abandonment finding despite testimony that the respondent mailed children infrequent cards and letters). We continue to express "no tolerance for a parent 'who makes halfhearted or no attempts to visit or contact his or her child within the six-month statutory time period * * * .'" In re Brook Ann R., 994 A.2d 1241, 1244 (R.I. 2010) (quoting In re Abby D., 839 A.2d 1222, 1225 (R.I. 2004)). Any evidence of attempted contact with Livia by the respondent was "halfhearted" at best and, as such, the trial justice rightfully declined to assign it weight in his decision. The trial justice's abandonment determination rested on sufficient factual findings and credibility determinations, which were supported by legally competent evidence.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the order of the Family Court. The record shall be remanded to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  In re Livia B.L.

**CASE NO:**  No. 2015-217-Appeal.
(06-6631)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  January 6, 2017

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**  Washington County Family Court

**JUDGE FROM LOWER COURT**:

Associate Justice Stephen J. Capineri

**ATTORNEYS ON APPEAL:**

For Petitioner:  Richard A. Merola, Esq.

For Respondent:  Susan B. Iannitelli, Esq.